Margaret S. HALL, Plaintiff,

v.

MARION SCHOOL DISTRICT NO. 2, Defendant.

No. 4:91–1577–21.

United States District Court, D. South Carolina, Florence Division.

Jan. 25, 1993.

Richard M. Gergel and W. Allen Nickles, III, Columbia, SC, for plaintiff.

Kenneth L. Childs and David E. Dubberly, Columbia, SC, for defendant.

## ORDER

TRAXLER, District Judge.

Plaintiff Margaret S. Hall ("Hall"), a public school teacher, brings this action pursuant to 42 U.S.C. § 1983 alleging that her former employer, Defendant Marion School District No. 2 ("district"), violated her constitutional rights. Specifically, Hall contends that she was involuntarily transferred and subsequently discharged by the district for exercising her right of free speech. She further alleges that the district deprived her of a property interest without due process of law. For the reasons stated below, this court finds that the district's actions in transferring and terminating Hall from her teaching position violated her constitutional rights under the First Amendment of the United States Constitution.

## FINDINGS OF FACT

Hall was a special education teacher at North Mullins Primary ("N.M.P.") School located in Mullins, S.C. Mullins is a small, rural town situated in Marion County. Hall had been a certified professional teacher for over 22 years, and at the time of the incidents surrounding this case, was within 10 months of retirement. Hall had taught at N.M.P. for almost five years (June 1986 to May 1991) and consistently received superior teacher evaluations.[1]

The 1990–91 school year at N.M.P. began routinely and continued so until December 5, 1990, when the local newspaper, *The Marion Star–Mullins Enterprise* ("*Star–Enterprise*"), published a letter to the editor written by Hall. Her letter publicly congratulated three members of the county school board whose efforts were instrumental in refusing a request to send six board members to a convention in San Francisco at a cost of over $10,000.[2] The proposed trip was characterized as "a luxurious vacation" at taxpayer expense. Further, the letter requested the identification of the six board members, who "had the gall to request funds for this trip." (Pl.'s Ex. 40.)

In the ensuing weeks, Hall wrote a series of letters to various newspapers,[3] alleging budget mismanagement by Marion County school officials. Additionally, she, along with her husband, wrote Foil, the superintendent of her school district, demanding[4] "the names of the three Mullins School Board Members which requested funds for a trip to California at the taxpayers['] expense." (Pl.'s Ex. 43.)

To put it mildly, Foil was displeased with Hall's letters and the FOIA request. He expressed his displeasure in a December 21, 1990, memorandum addressed to the members of the Board of Trustees of Marion School District No. 2 (the "board").[5] The memorandum read in part:

> Speaking of putting a lid on our current gadfly brings the note on the enclosed newspaper "letter to the editor." We (C. LeGette and I) cannot say that the barrage of opinions and innuendoes does not bother us.... Where does free speech depart from libel and slander? Maybe enough rope will allow our gadfly to suspend herself in an awkward position. Hopefully, it will be an uncomfortable one.

(Def.'s Ex. 17.)

In January 1991, Hall's husband, Ron, requested, pursuant to the FOIA, numerous items including the salaries of several district employees—ranging from superintendent to custodian—as well the travel expenses of all school administrators for the three previous years. (Def.'s Ex. 18); (Pl.'s Ex. 59.) When Foil requested a $500 deposit to allegedly defray the cost of complying with the latest FOIA request, (Def.'s Ex. 20), Ron wrote an editorial criticizing Foil for requiring such a large deposit for the disclosure of public information. (Pl.'s Ex. 55.)

---

1. During the 1990–91 school year, Hall received score averages of 4.7 and 4.5 on her formative and summative teacher evaluations. (Pl.'s Exs. 106 & 108.) These scores placed Hall's teaching skills between commendable (4.0) and superior (5.0).

2. Marion County is divided into four school districts. N.M.P. is in Marion Sch. Dist. No. 2 which is frequently referred to as Mullins Sch. Dist. No. 2. Dr. William C. Foil ("Foil") is the superintendent of Marion Sch. Dist. No. 2. Foil and one other local superintendent each requested funds for three members of their district to attend the California convention. Unlike the superintendent of Marion Sch. Dist. No. 1, Foil refused to release the names of the board members for whom he requested funds, citing "security reasons."

3. In addition to the Star–Enterprise, Hall's editorials were published in *The Florence Morning News* and *The State* newspaper. All of the editorials were critical, in general, of expenditures made by the Marion County school system, and specifically decried the attempt by six board members to attend the California convention. *See* (Pl.'s Exs. 41, 46, & 50); (Def.'s Ex. 9.)

4. The Halls made their request pursuant to the South Carolina Freedom of Information Act ("FOIA"), S.C.Code Ann. §§ 30–4–10 to –110 (Law.Co-op.1991).

5. Beginning on December 17, 1990, and continuing through July 1991, Foil provided the board with 18 memoranda which included comments concerning the Halls. Foil's comments were negative as well as retaliatory in nature, and appear to have been the board's major source of information regarding the Hall situation.

The public statements that Hall and her husband were making angered and embarrassed a number of people in the North Mullins school system. Tension rose between Hall, her fellow teachers, and the N.M.P. principal, Cynthia M. LeGette ("LeGette")—the teachers and LeGette were personally affronted because they felt a number of Hall's comments reflected negatively upon them.[6]

By this time Foil was furious with the Halls.[7] He expressed his outrage on February 1, 1991, in yet another memorandum to the board in which he wrote:

> I have asked everyone's opinion about writing to the newspaper; and then ignored their good advice and my own practice of patience by writing *some* of my thoughts to the Editor. I could not stand to hold still any longer. I hope that I do not embarrass you or the district. There is an ad which I paid for in next week's paper. The letter is enclosed. The ad will be a surprise.

(Pl.'s Ex. 7.) On February 6, 1991, The *Star–Enterprise* published an "advertisement" from Foil measuring approximately 4″ × 6″ in size. Foil's advertisement was more than a surprise; it was a public display of annoyance and anger. The menacing advertisement, which unquestionably threatened Hall, read as follows:

### REMEMBER THIS

IF YOU WORK FOR A MAN, in Heaven's name, WORK for him. If he pays you wages which supply you bread and butter, work for him; speak well of him; stand by him and stand by the institutions he represents. If put to a pinch, and ounce of loyalty is worth a pound of cleverness. If you must vilify, condemn and eternally disparage—resign your position, and when you are outside, damn to your heart's content, but as long as you are a part of the institution do not condemn it. If you do that, your are loosening the tendrils that are holding you to that institution, and at the first high wind that comes along, you will be uprooted and blown away, and probably will never know the reason why.

Final Word from BILL FOIL. Paid for with private funds by Bill and his two friends.

(Pl.'s Ex. 61 [mistake in original].)

Understandably, the Halls were outraged by Foil's "Final Word" ad. Ron Hall wrote the chairman of the board requesting that the board reprimand Foil for the threatening ad and demanding a public apology from Foil. (Pl.'s Ex. 73.) Neither was done. Incredibly, the board did not find Foil's ad intimidating. Adding insult to injury, the board informed Hall that the ad "was placed in a display advertisement and paid for by a private citizen exercising his First Amendment rights in freedom of speech." (Pl.'s Ex. 18.) In fact, throughout this entire affair the board refused to intervene. Despite receiving numerous memoranda in which Foil openly discussed his contempt for Hall and his plans to punish her, the board refrained from correcting Foil. This court finds that the board's silence and inaction evidenced a willingness on the part of the board to ratify Foil's actions.

The pressure on Hall became immense. Not only was she experiencing public intimidation from Foil, but she was also becoming the target of criticism from within the school itself. Her visitors and the times of her arrival and departure were closely monitored. She was given warnings of rules infractions, many of which were the most picayune. Unfortunately, her reaction to this pressure was far from conducive to an amicable handling of the problems, if indeed that was possible. Instead of open communication between Hall and LeGette, Hall avoided contact with the principal and chose to communicate by memorandum and letter. These memoranda reflect growing distress on the part of Hall. For example, she copied every-

---

6. There had been an incident at the school the previous year between Hall and her fellow teachers involving a petition for a telephone in the teachers' lounge.

7. Foil admitted in a memorandum to the board that when asked at a Teachers' Council meeting to further elaborate on his response to a question obviously raised by Hall, he told the N.M.P. representative who asked the question on Hall's behalf to "tell her to go to hell." (Pl.'s Ex. 21.)

one from fellow teachers to the President of the United States. She regularly copied her attorney. One memorandum to LeGette was 19 pages long. Her list of grievances about the school system ran from the serious to the most trivial.

At this point, it is important to note what was transpiring between LeGette and Foil. LeGette was receiving memorandum after memorandum from Hall personally criticizing the principal and complaining about various matters. Hall refused to meet with LeGette. LeGette, in turn, was communicating with Foil and providing the superintendent with copies of the letters she was receiving from Hall. However, according to LeGette, Foil constantly counselled caution and restraint with Hall, not permitting the principal to respond. This lack of response to Hall did nothing to ameliorate the situation.

To understand Foil's tactics, one need only harken back to the contents of his "Final Word" ad and his remark to the board that "enough rope will allow our gadfly to suspend herself in an awkward position." As the months went by, however, Hall did not "suspend herself." She continued to teach and to teach well. The evaluations of her classroom performance were exceptional. *See supra* note 1. In April 1991, she was offered a teaching contract for the following school year. It is notable that this contract was offered to her without conditions and without probation. (Pl.'s Ex. 104.)

On April 1, 1991, Dr. Barbara Nielsen, Superintendent of Education for the State of South Carolina, appointed Hall to serve on a blue ribbon task force in the State Department of Education for "Teachers As Professionals." (Pl.'s Ex. 15.) This public accolade for Hall deepened the division between Hall and her opponents. For Hall it was both vindication and authority. For her fellow teachers, the principal, and the superintendent, it was simply incredible. Letters of protest, some open and some veiled, arrived in Dr. Nielsen's office, questioning the appointment.

Hall went to work immediately on the "Teachers As Professionals" committee and distributed a questionnaire to her fellow teachers soliciting both their opinions on whether they felt they were treated as professionals, and recommendations "for upgrading the teaching profession." (Def.'s Ex. 25.) Hall intended to report the results of her survey to Dr. Nielsen. Predictably, constructive response to Hall's questionnaire was virtually nonexistent. Many who did respond simply wrote "no problems" or "no complaints." Once again, Hall turned to the newspaper to vent her frustrations. She wrote another letter to the editor which appeared in the April 17, 1991, edition of the *Star–Enterprise.* The letter contained the entire questionnaire, as well as the following paragraph:

> To those that write "no complaints," evidently they are rather myopic as teachers and are completely satisfied with their *salary, class load, text book choices,* etc. It must be nice to be so completely oblivious to the *obvious problems surrounding our educational system* that "when Johnny can't read" it just doesn't seem to bother some of our "educators." And the reason "Johnny can't read" is because *a few of our teachers simply think "everyone is just fine," that reform is not needed.* How tragic for our children.

(Pl.'s Ex. 85.) (emphasis added).

That same day a meeting was called by the N.M.P. teachers to discuss Hall. Less than a week later, on April 22, 1991, LeGette received a petition, signed by the majority of the N.M.P. teachers, recommending the transfer of Hall to another school. (Pl.'s Ex. 20.) Also on April 22, Hall received an anonymous letter from "some concerned Marion County educators." The letter begins, "It concerns some of us deeply that you have chosen to air your differences with the Marion County School System in the newspaper." The letter concludes, "Your day is coming, Mrs. Hall." (Def.'s Ex. 33.)

The situation only worsened. On May 6, 1991, Foil wrote Hall requesting that she provide him with "verification that you did indeed take your daughter to visit a doctor on the afternoons of Friday, April 19, 1991, and Wednesday, May 1, 1991." (Pl.'s Ex. 22.)

In light of the entire situation, the district decided to consult a lawyer. Sometime in late April or early May, Foil and others met with an attorney, Bruce Davis, who specialized in school matters in an effort to explore ways to eliminate the Hall problem. The situation was presented to Davis, and it was conceded that the evidence against Hall was thin. The attorney advised of the need for "hard evidence." (Pl.'s Ex. 27); (Def.'s Ex. 50.)

Following the direction of attorney Davis, members of the school system began to look for evidence of wrongdoing on Hall's part. LeGette actually followed Hall once when Hall left school to see exactly where she went. This effort provided only proof that Hall had visited her doctor.

During this same period of time, a volunteer environmental organization in Mullins, with which Hall was closely associated, received national recognition from the Chevron Corporation for its outstanding work. (Pl.'s Ex. 26.) Hall was named by the organization as its representative to receive the conservation award to be given by Chevron at a banquet to be held in Washington, D.C. To attend the awards ceremony, Hall requested permission to be absent from school on May 14, 15, and 16. Foil denied her request. (Pl.'s Ex. 24.)

While Foil turned down Hall's request to go to Washington, D.C., he suspected that she would go anyway. Accordingly, the district's public information officer hired a photographer to take a picture of the person who received the conservation award. Foil also directed LeGette to call the hotel in Washington, D.C. where the Halls had planned to stay to ascertain the names in which the rooms were reserved. The hotel confirmed that the Halls had reservations for May 14 and 15. The trap was set. When the days in question came, Hall aggravated the situation by calling in sick for three consecutive days. Foil was sure they had her this time.

In a May 22, 1991, memorandum to the board Foil wrote that the photographer had yet to send the "publicity/identification photo" of Hall receiving the award. Foil cautioned the board members that "Bruce Davis wishes to have the 'hard evidence' in hand before proceeding." (Pl.'s Ex. 27.) Despite his words of restraint, Foil had already drafted a letter informing Hall that she was immediately suspended and that he was recommending her dismissal "on the basis of dishonest reasons having been given for leaving school and for being absent from school." (Pl.'s Ex. 29.)

Unfortunately, the "hard evidence" did not materialize. There was no proof Hall went to Washington, D.C. The district received a picture of Hall's *daughter* receiving the award. (Pl.'s Ex. 33–B.)

Still no evidence, still no valid reason to terminate Hall.

Foil, however, was undaunted. In a May 24, 1991, memorandum to the board, Foil declared: "Bruce Davis and I agree that the reason is a bit thin, but I am ready to take the chance even if the Board has to reinstate her and force me to apologize on my knees at high noon on the courthouse steps.... I want to act even if it means saying that I am sorry!" (Pl.'s Ex. 50.) The superintendent shortly thereafter took Hall out of the school and transferred her to the district office where he assigned her to sit in a vacant room until the end of the school year. (Def.'s Ex. 51 & Pl.'s Ex. 93.)

At this point it is important to note several things. First, there were no efforts made by anyone connected with the district to warn Hall that her status as a teacher at N.M.P. was in jeopardy. She was not informed of the severity with which the district professed to view her alleged transgressions within N.M.P. Outside of the letter notifying Hall that she would be transferred (dated May 27, 1991) and the one regarding her dismissal (dated June 27, 1991), Hall's personnel file contains no formal reprimand or criticism regarding her behavior or teaching performance. While it is true that the LeGette did give her notes, did discuss a few things orally, and did attempt to set up several meetings, no reasonable person would have thought from all of the circumstances presented to Hall that her transfer or discharge was being contemplated. There simply was no indication given to Hall that her position

as teacher within N.M.P. was in jeopardy.[8] Second, warnings, as an evidentiary matter, would indicate an honest effort on the part of the district to resolve a problem. When these actions are *not* taken, it is reasonable to assume, as this court does, that the district was not dealing with its teacher in good faith and had motives *other than* reaching a fair resolution of the problem. Such a failure to warn also belies the assertion that a sufficient reason for transfer or termination existed.

The way in which Foil handled the entire situation is consistent with the attitude he previously expressed of hoping that Hall would "suspend herself in an awkward position." Evidently, Foil had hopes that Hall would do something that would constitute, in and of itself, an independent basis for her dismissal. When following Hall produced no evidence and surveillance in Washington, D.C. proved fruitless, it appeared Foil and LeGette would be without the "hard evidence" they knew they needed to terminate Hall. Then, coincidentally, Foil apparently responded to the previous month's teachers' petition requesting Hall's transfer. Foil decided to transfer Hall to a vacant office at the school district administration building. For the last week of the school year, Hall sat in the empty office with virtually nothing to do.

The school year ended, and by letter dated June 27, 1991, the board notified Hall *for the first time* that she would be discharged as a teacher.[9] (Pl.'s Ex. 36.) The notification states in relevant part: "It has been brought to our attention ... your uncooperative and disrespectful attitude and behavior.... is conduct manifesting an evident unfitness for teaching warranting immediate dismissal." *Id.* In light of Foil's failed crusade to obtain a valid reason for Hall's dismissal, this court finds that it was Foil himself who recommended the discharge of Hall on the basis of "an evident unfitness for teaching." A hearing on the issue of Hall's termination was held before the board, but the result was a foregone conclusion.

Foil's campaign to dismiss Hall had begun immediately after Hall voiced her opinion on matters of public concern. Foil's memoranda throughout the year to the board members clearly showed his personal antagonism for Hall and his goal of terminating her. The board's affirmance of Hall's dismissal on September 6, 1991, was the culmination and ratification of Foil's plan: "[A]t the first high wind that comes along, you will be uprooted and blown away, and probably will never know the reason why." ("Final Word" ad, Pl.'s Ex. 61.) Hall knows the reason why, as does this court—her expressions on matters of public concern.

## CONCLUSIONS OF LAW

### A. *First Amendment*

The applicable constitutional principles have been developed in numerous opinions of the last quarter of a century, and are not disputed. Simply stated, "A state may not dismiss a public school teacher because of the teacher's exercise of speech protected by the First Amendment." *Stroman v. Colleton County Sch. Dist.,* 981 F.2d 152, 155 (4th Cir.1992); *accord Pickering v. Bd. of Educ.,* 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968); *Piver v. Pender County Bd. of Educ.,* 835 F.2d 1076 (4th Cir.1987), *cert. denied,* 487 U.S. 1206, 108 S.Ct. 2847, 101 L.Ed.2d 885 (1988).

In *Pickering,* a public school teacher was dismissed for writing an editorial to the local newspaper criticizing the school board's allocation of funds between the school's educational and athletic programs. *Id.,* 391 U.S. at 566, 88 S.Ct. at 1733. The school board considered the letter defamatory, and justified the firing of the teacher as action taken

---

8. However, S.C.Code Ann. § 59–25–440 (Law. Co-op.1990) states that a principal or a person "charged with the supervision of a teacher finds it necessary to admonish a teacher ... he shall: (1) bring the matter in writing to the attention of the teacher to correct whatever appears to be the cause of potential dismissal ... and, (2) ... allow reasonable time for improvement." *Id.* Thus, it appears that the district had a statutory

duty to warn Hall that she was facing possible transfer or termination.

9. As discussed above, see *supra* note 8, the notification of dismissal without previous warning appears to be a violation of S.C.Code Ann. § 59–25–440.

in the best interest of the school. *Id.* at 567, 88 S.Ct. at 1734. Initially, the Court found that the editorial dealt with matters of public concern: "[T]he question whether a school system requires additional funds is a matter of public concern.... On such a question free and open debate is vital to informed decision-making by the electorate." *Id.* at 571–72, 88 S.Ct. at 1736–37. As such, the editorial was entitled to First Amendment protection.[10] Further, on educational matters of public concern, the Court found teachers, in general, particularly qualified to voice their opinions without fear of termination:

> Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, *it is essential that they be able to speak out on such questions without fear of retaliatory dismissal.*

*Pickering,* at 572, 88 S.Ct. at 1736 (emphasis added). Accordingly, the Supreme Court held that, "absent proof of false statements knowingly or recklessly made," a teacher's exercise of his First Amendment right to speak on matters of public concern "may not furnish the basis for his dismissal from public employment." *Id.* at 574, 88 S.Ct. at 1737.

■ The right of a public school teacher to speak on matters of public concern is not absolute: "The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568, 88 S.Ct. at 1734.

■ The first step in ascertaining whether the First Amendment protects a public employee from discharge for engaging in protected speech is determining whether the speech in question fairly relates to a matter of public concern. This is a question of law, not fact. *Connick v. Myers,* 461 U.S. 138, 148 n. 7, 103 S.Ct. 1684, 1690 n. 7, 75 L.Ed.2d 708 (1983); *Dwyer v. Smith,* 867 F.2d 184, 193 (4th Cir.1989); *Daniels v. Quinn,* 801 F.2d 687, 689 (4th Cir.1986). Personal grievances, complaints, and criticism are examples of speech which do not address matters of public concern, and are not protected by the First Amendment. *Connick,* 461 U.S. at 146–47, 103 S.Ct. at 1689–90; *Stroman,* 981 F.2d at 156. However, even personal complaints may touch upon matters of public concern, thereby triggering some First Amendment protection. *See Connick,* 461 U.S. at 154, 103 S.Ct. at 1694. Accordingly, the matter of public concern inquiry "must be determined by [examining] the content, form, and context of a given statement, as revealed by the whole record." *Connick,* at 147–48, 103 S.Ct. at 1690–91.

■ If the speech addresses a matter of public concern, "the question then becomes whether the employee would have been discharged 'but for' the speech." *Daniels,* 801 F.2d at 689. This "but for" test derives from Chief Justice Rehnquist's opinion in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy,* the Supreme Court held, *inter alia,* that even if a teacher's exercise of constitutionally protected conduct played a substantial role in a school board's decision not to rehire the teacher, that fact alone does not "necessarily amount to a constitutional violation justifying remedial action." *Id.* at 285, 97 S.Ct. at 575. The Court then added another element to the *Pickering* balancing test:

> [T]he burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondents having car-

---

**10.** In the recent *Stroman* opinion, the Fourth Circuit observed that a disgruntled teacher's letter voicing complaints primarily about summer pay practices; but also mentioning *budget mismanagement* committed by school officials, and *"publicly funded out-of-town trips by School District personnel"* touched upon matters of public concern. *Id.,* 981 F.2d at 158 (emphasis added).

Because of the public concern implications raised by the letter, the court went on to "weigh whatever public interest commentary may be contained in the letter against the state's dual interest as a provider of public service and employer of persons hired to provide that service." *Id.*

ried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

*Mt. Healthy,* at 287, 97 S.Ct. at 576 (footnote omitted); *accord Givhan v. Western Line Consol. Sch. Dist.,* 439 U.S. 410, 417, 99 S.Ct. 693, 697, 58 L.Ed.2d 619 (1979); *Daniels v. Quinn,* 801 F.2d 687, 689 (4th Cir.1986) ("The employee bears the burden of demonstrating that protected speech was a motivating factor in the discharge. The burden then shifts to the employer to show that it would have reached the same decision even in the absence of the protected conduct.").

■ Finally, if the protected speech was the "but for" cause of a public employee's discharge, the court must then determine if the public concern aspects of the employee's speech outweigh the employer's interests in managing its workplace effectively and free from disruption. If the balance tips in favor of the employer, there is no constitutional violation. *Connick,* 461 U.S. at 150–54, 103 S.Ct. at 1691–94; *Daniels,* at 689–90.

To summarize, the First Amendment protects a public school teacher from discharge when (1) the teacher speaks as a citizen on matters of public concern; (2) "but for" the protected speech, the teacher would not have been dismissed; and (3) the teacher's interest in exercising free speech outweighs the state's countervailing interest "in providing the public service the teacher was hired to provide." *Stroman,* 981 F.2d at 156; *Mt. Healthy,* 429 U.S. at 283–87, 97 S.Ct. at 574–76; *Daniels,* 801 F.2d at 689–90; *see Pickering,* 391 U.S. at 568, 88 S.Ct. at 1734; *Piver,* 835 F.2d at 1078.

■ Without question, Hall, on numerous occasions, spoke as a citizen on matters of public concern. Her initial letter to the editor alleged a waste of public funds by the county school board. Allegations of budget mismanagement by school officials clearly address matters of public concern. *Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736–37; *Stroman,* 981 F.2d at 158. Hall's editorial openly questioned the priorities of the school board members who requested funds to attend a convention in California. Her letter clearly implied that such funds should be expended in a manner that was directly beneficial to the students of Marion County. The Fourth Circuit has specifically stated that comments concerning "publicly funded out-of-town trips by School District personnel" address matters of public concern. *Id.* Examining the "content, form, and context" of Hall's speech, this court concludes that Hall's December 5, 1990, letter to the editor unquestionably addresses matters of public concern. *Connick,* 461 U.S. at 147–48, 103 S.Ct. at 1690–91.

In a similar manner, Hall's FOIA request demanding the names of the board members who requested funds to attend the California convention also addresses a matter of public concern. To argue otherwise is to contend that a citizen has no interest in the identity of elected officials who request public funds for out-of-town trips. Such an argument is contrary to the teachings of our Supreme Court. *See Pickering,* 391 U.S. at 571–72, 88 S.Ct. at 1736–37 (allocation of public funds by school system is a matter of public concern, and debate on such matters is vital to insure "informed decision-making by the electorate").

Additionally, Hall's April 17, 1991, letter to the editor addresses matters of public concern. The thrust of this editorial is a call for reform in the Marion County educational system. The editorial specifically mentioned teachers' salaries, class loads, and text book choices. Once again, an examination of the "content, form, and context" of this editorial reveals that it addresses matters of public concern. As the Fourth Circuit has stated, "The subject of maternity leave is, like teachers' salaries and other benefits, properly a matter of public interest. Finally, a teacher has the right to voice concerns about matters which affect the education of her students." *Daulton v. Affeldt,* 678 F.2d 487, 491 (4th Cir.1982) (citations omitted).

■ Since Hall's speech addressed matters of public concern, "the question then becomes whether [she] would have been discharged 'but for' the speech." *Daniels,* at

689. This "but for" test requires a two-part inquiry. Initially, the burden is placed on Hall to show that her protected speech was a motivating factor in the district's decision to fire her. *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. at 576; *Daniels,* at 689. This court finds that Hall easily meets her burden.

Foil testified that in 1986 he recommended the hiring of Hall as a teacher at N.M.P. It is undisputed that every year thereafter, including the last tumultuous school year, she received superior evaluations and had her contract renewed. Further, it is undisputed that during the 1989–90 school year, Hall had been the cause of an incident at N.M.P. regarding the installation of a telephone in the teachers' lounge.

Foil, however, took no interest in Hall until *after* the publication of her December 5, 1990, letter to the editor. In fact, Foil testified that he perceived Hall's initial editorial as an attack on him. Shortly *thereafter,* Foil developed a disdain for Hall. In a December 21, 1990, memorandum to the board, Foil wrote about "putting a lid on our current gadfly," and surmised that "[m]aybe enough rope will allow our gadfly to suspend herself in an awkward position." Of course, there is Foil's "Final Word" ad which appeared *after* the publication of additional editorials critical of the school system and repeated FOIA requests. This thinly veiled threat warned Hall that "[i]f you must vilify, condemn and eternally disparage.... your are loosening the tendrils that are holding you to that institution, and at the first high wind that comes along, you will be uprooted and blown away." This court finds that these two responses were the direct result of Hall's unquestionably protected speech.

Additionally, it was Foil who captained the unsuccessful operation to produce "hard evidence" to dismiss Hall—including, but not limited to, hiring a photographer to take a picture of Hall accepting an award in Washington, D.C.; allowing LeGette to follow Hall after school to ascertain her whereabouts; and instructing LeGette not to respond to Hall's complaints. As for this last tactic, it is entirely reasonable to conclude, and this court does conclude, that the instructions to leave Hall alone were a continuing part of Foil's plan, motivated by Hall's exercise of her First Amendment rights, to give her "enough rope" to hang herself. In other words, Foil decided that giving Hall free rein would lead to an independent basis, apart from the exercise of her constitutional rights, to punish her for publicly complaining about the school district.

Finally, it should be noted that it was Foil who transferred Hall and later recommended her dismissal. Considering Foil's retaliatory conduct and his influence over board members, this court finds that Hall's protected speech was a motivating factor in the decision of the district to discharge her.

Accordingly, the burden shifts to the district to show by a preponderance of the evidence that it would have reached the same employment decision even in the absence of the protected speech. *Mt. Healthy,* at 287, 97 S.Ct. at 576. I find that the district has utterly failed in its burden to prove that it would have dismissed Hall even if she had not exercised her right of free speech. The district asserts the board discharged Hall because her "uncooperative and disrespectful attitude and behavior" evidenced an unfitness to teach. (Pl.'s Ex. 36.)

The district's justifications for dismissing Hall raise more questions than answers. If Hall was "unfit to teach," why did she consistently receive evaluations which placed her teaching skills between commendable and superior? If she was "uncooperative and disrespectful," why did the district offer Hall a teaching contract free of any stipulations or probationary terms? Further, why did Foil, as superintendent, sign Hall's contract? If Hall was a disruptive influence, one would presume that her personnel file would reflect this. However, a review of Hall's personnel file reveals that she received no formal reprimand or criticism regarding her behavior prior to receiving notification of her transfer (dated May 27, 1991) and dismissal (dated June 27, 1991).

The evidence in this case overwhelmingly shows the pretextual nature of the reasons proffered by the district for dismissing Hall. For example, Foil's comment regarding the need for "hard evidence" before proceeding,

and his subsequent remark about being willing to dismiss Hall even if the "reason is a bit thin" unquestionably reveal that he and the board knew they lacked a legitimate reason for dismissing Hall. However, the most extraordinary evidence of an effort to create a separate legal basis for terminating Hall was the district's attempt to photograph Hall at a Washington, D.C. awards ceremony. The antics involved in this charade included hiring a photographer to photograph the person receiving the award and confirming that the Halls had hotel reservations in the nation's capital during the days in question.

Despite its efforts, the district cannot conceal the true motive for terminating Hall. As in *Pickering*, the school board discharged a teacher for publishing criticism of the local school system. This court finds the district's proffered reasons for dismissing Hall lack credibility. Accordingly, this court finds that "but for" Hall's protected speech, the district would not have dismissed her. *Mt. Healthy*, at 287, 97 S.Ct. at 576; *Daniels*, at 689.

▪ Hall, as a teacher, was a member of a class which is most likely to have informed, intelligible opinions on how school funds should be allocated. *Pickering*, 391 U.S. at 572, 88 S.Ct. at 1737. Accordingly, she was entitled to speak out on such matters "without fear of retaliatory dismissal." *Id.* Further, the district has failed in its burden of showing that it would have dismissed Hall in the absence of her protected speech. Considering the importance of free debate on the issue of public education as well as an employer's interest in managing its workplace efficiently, this court finds that Hall's interests in speaking as a citizen on educational matters of public concern outweigh the district's interest in operating its schools completely free from disruption.[11] *Id.* at 568, 88 S.Ct. at 1734; *Connick*, 461 U.S. at 150–54, 103 S.Ct. at 1691–94; *Daniels*, at 689–90. Therefore, this court concludes that the actions of the district in transferring and sub-

sequently terminating Hall for engaging in protected speech violated her First Amendment rights under the United States Constitution.

### B. *Municipal Liability*

▪ The district contends that even if Foil and LeGette (both district employees) violated Hall's constitutional rights, the district cannot be held vicariously liable for the acts of its employees. The district correctly notes that municipal liability under 42 U.S.C. § 1983 cannot be predicated under a *respondent superior* theory. *Monell v. Dep't of Social Servs. of the City of N.Y.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978) (concluding that "a municipality cannot be held liable *solely* because it employs a tort-feasor.").

In *Monell*, the Supreme Court held that a municipality is subject to § 1983 liability when the governmental entity, acting pursuant to policy or custom, commits a constitutional tort:

> We conclude, therefore, that a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, *it is when execution of a government's policy or custom*, whether made by its lawmakers or by those whose edicts or acts may fairly said to represent official policy, *inflicts the injury that the government as an entity is responsible under § 1983.*

*Id.* at 694, 98 S.Ct. at 2037 (emphasis added).

▪ Establishing the existence of a governmental policy for § 1983 purposes does not require a showing that the alleged policy was followed on a regular basis. Instead, a single decision by municipal policymakers may suffice as "official policy" which triggers municipal liability:

> The "official policy" requirement was intended to distinguish acts of the *municipality* from acts of *employees* of the mu-

---

**11.** Although the district contends that Hall's numerous memoranda to LeGette establish a basis for showing that Hall was a disruptive influence, this court finds that Hall's writings to the principal were caused by the unwarranted pressures being placed on her by members of the school system. The district cannot create the problem and later claim it as a reason for Hall's dismissal. In any event, this court regards the correspondence between LeGette and Hall as generally addressing employee-employer grievances. As such, it is not entitled to constitutional protection. *Connick*, 461 U.S. at 146–47, 103 S.Ct. at 1689–90.

nicipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible.... acts ... which the municipality has officially sanctioned or ordered.

With this understanding, it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances.

*Pembaur v. City of Cincinnati*, 475 U.S. 469, 479–80, 106 S.Ct. 1292, 1298–99, 89 L.Ed.2d 452 (1986) (footnote omitted). Elaborating on the concept that a single decision may constitute "official policy," the Court noted that "a government frequently chooses a course of action tailored to a particular situation and not intended to control later situations. *If the decision to adopt that particular course of action is properly made by that government's authorized decisionmakers, it surely represents government 'policy'* as that term is commonly understood." *Id.* at 481, 106 S.Ct. at 1299 (emphasis added). Authorized decisionmakers for § 1983 purposes are officials possessing final policymaking authority "with respect to the subject matter in question." *Id.* at 483–84, 106 S.Ct. at 1300–01 (plurality portion of opinion).

■ Accordingly, the fact that the decision to transfer and subsequently terminate Hall comprised a single incident does not preclude this decision from constituting "official policy" for § 1983 purposes. Instead, if the "particular course of action" taken was unconstitutional—transferring and later discharging Hall because she exercised her First Amendment rights—the district is liable "[i]f the decision to adopt that particular course of action [was] properly made by [the district's] authorized decisionmakers." *Id.* at 481, 106 S.Ct. at 1299.

In *City of St. Louis v. Praprotnik*, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), the Supreme Court once again considered when isolated acts by government officials result in municipal liability. A plurality of the Court, in an attempt to clarify *Pembaur*, agreed on four guiding principles:

First, ... municipalities may be held liable under § 1983 only for acts which the municipality itself is actually responsible, "that is, acts which the municipality has officially sanctioned or ordered." Second, only those municipal officials who have "final policymaking authority" may by their actions subject the government to § 1983 liability. Third, whether a particular official has "final policymaking authority" is a question of *state law.* Fourth, the challenged action must have been taken pursuant to a policy adopted by the official or officials responsible under state law for making policy in *that area* of the city's business.

*Praprotnik*, at 123, 108 S.Ct. at 924 (citations omitted).

To avoid municipal liability the district emphasizes that the relevant state actors involved with the Hall situation—Foil and LeGette—lacked "final policymaking authority." Accordingly, the district argues, the actions of Foil and LeGette cannot support the imposition of § 1983 liability on the district.

■ Whether particular officials have final policymaking authority is a question of state law. *Id.* Under South Carolina law, with regards to employing and discharging teachers, the board is the final policymaker of the district. S.C.Code Ann. §§ 59–19–10 & 90(2) (Law.Co-op.1990).[12] These two sections of the South Carolina code, however, do not grant school officials unbridled authority to reprimand teachers for exercising their First Amendment rights.

The plurality in *Praprotnik* recognized the potential loophole created by predicating municipal liability solely on decisions made by final policymakers. Accordingly, the plurality made it clear that a municipality may not insulate itself from § 1983 liability simply by transferring policymaking authority to government officials who lack *final* policymaking authority:

[T]he authority to make municipal policy is necessarily the authority to make *final*

12. Section 59–19–10 provides that "[e]ach school district shall be under the management and control of the board of trustees ..."

Section 59–19–90(2) declares, *inter alia,* that the board of trustees shall "[e]mploy teachers ... and discharge them when good and sufficient reasons for so doing present themselves ..."

policy.... "[W]hen a subordinate's decision is subject to review by the municipality's authorized policymakers, they have retained the authority to measure the official's conduct for conformance with *their* policies. *If the authorized policymakers approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality* because their decision is final.

*Praprotnik,* at 127, 108 S.Ct. at 926 (emphasis added in part); *see also Soderbeck v. Burnett County, Wis.,* 752 F.2d 285, 293–94 (7th Cir.) (holding, *inter alia,* whether law enforcement committee [final policymaker] exposed county to § 1983 liability by participating in or ratifying sheriff's firing of subordinate was question for jury), *cert. denied,* 471 U.S. 1117, 105 S.Ct. 2360, 86 L.Ed.2d 261 (1985); *Thompson v. Bd. of Educ.,* 711 F.Supp. 394, 411–13 (N.D.Ill.1989) (holding, *inter alia,* that municipality is liable under § 1983 when school board retains authority to review and ratify superintendent's retaliatory decision to involuntarily transfer librarian for exercising her First Amendment rights).

In this case Foil recommended the discharge of Hall.[13] By letter of September 6, 1991, the board dismissed Hall. The district contends that the board reached its decision without input from Foil. I disagree. The evidence and testimony clearly indicate that Foil was the "eyes and ears" of the board. To assert to the contrary, as the district does, belies the obvious. Foil has been the superintendent of the district for approximately 16 years. Moreover, throughout this entire fracas, Foil constantly kept the board informed of Hall's activities through numerous memoranda—18 in all—each of which presented only his slanted view of the situation. Accordingly, I find that Foil's disparaging comments tainted any unbiased views the board members may have had concerning the situation.

Moreover, I find that Foil exerted such a strong influence over the board, that effectively his decisions became the board's decisions. The most egregious example of Foil's influence over the board occurred after the publication of the "Final Word" ad. Hall's husband, incensed by the thinly veiled threat of retaliation, demanded that the board reprimand Foil. The board, expressing no displeasure over the public advertisement by its superintendent, refused. In fact, the board did not even ask Foil to apologize for threatening Hall. Amazingly, the board specifically found that the ad was not intimidating. Additionally, the board stated that Foil had a constitutional right to publish any ad he was willing to pay for. Beyond a mere refusal to intervene on the behalf of Hall, these comments by the board appear to actually condone the superintendent's behavior.

Given the animosity between Foil and Hall, along with the power the Foil wielded, it is unreasonable to believe that the board independently decided to discharge Hall. The evidence abundantly shows that the board, like the law enforcement committee in *Soderbeck,* "participated in—at least by ratifying, but in any event not just by passively refusing to intervene in—[Foil's] firing of [Hall]." *Id.* at 294.

█ At a minimum, the board ratified Foil's unconstitutional actions. Ratification of unconstitutional actions by officials possessing final policymaking authority subjects a municipality to § 1983 liability. *Praprotnik,* 485 U.S. at 127, 108 S.Ct. at 926; *Soderbeck,* at 293–94; *Thompson,* at 413. This court finds that the board's refusal to intervene on behalf of Hall and its subsequent agreement to discharge her, despite knowledge of Foil's plans to terminate her for obviously improper reasons, constitutes board ratification of Foil's conduct. This

---

**13.** Initially, Foil drafted a letter dated May 27, 1991, informing Hall that she had been suspended from teaching at N.M.P. In this "suspension" letter, Foil wrote, "I do further recommend to the Board of Trustees that action be instituted for your dismissal on the basis of dishonest reasons having been given for leaving school and for being absent from school." (Pl.'s Ex. 29.) Foil, evidently fearing that the "hard evidence" he was gathering to support his dismissal recommendation would fail to materialize, (see Pl.'s Ex. 27), refrained from sending the "suspension" letter. Instead, he sent a letter informing Hall that she would be transferred for the remainder of the 1990–91 school year. (Def.'s Ex. 51.)

ratification is chargeable to the district because the board's decision was final.

In sum, all of the credible evidence in this case indicates that the board, adhering to the demands of Foil, discharged Hall because she had spoken out on matters of public concern involving the district in general and the board in particular. Therefore, this court finds that in discharging Hall, the board, acting with final policymaking authority in the relevant area of state law, sanctioned, as well as participated in, a constitutional tort. Accordingly, the district is liable under § 1983. *Pembaur*, 475 U.S. at 479–80, 106 S.Ct. at 1298–99; *Praprotnik*, 485 U.S. at 123, 108 S.Ct. at 924.

### C. *Res Judicata and Collateral Estoppel*

By letter dated June 27, 1991, the board informed Hall that she could request a hearing "to show cause why [she] should not be dismissed." (Pl.'s Ex. 36). Hall requested a hearing, and in August 1991, the board, pursuant to S.C.Code Ann. §§ 59–25–460 to –480 (Law.Co-op.1990),[14] held a hearing regarding Hall's dismissal. Not surprisingly, the board concluded that although Hall "possess[ed] an exceptionally good knowledge of [her] subject matter," her "uncooperative and disrespectful attitude toward supervisory authority and teacher colleagues at North Mullins Primary School" warranted her dismissal. (Def.'s Ex. 56.) Hall did not seek judicial review of the board's decision in state court. Accordingly, the district argues, the unreviewed determination of the board precludes Hall from relitigating her First Amendment claim in federal court. *University of Tenn. v. Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986); *see Perry v. State Law Enforcement Div.*, 426 S.E.2d 334 (S.C.Ct.App.1992); *Bennett v. S.C. Dept. of Corrections*, 305 S.C. 310, 408 S.E.2d 230 (1991); *Earle v. Aycock*, 276 S.C. 471, 279 S.E.2d 614 (1981).

In *Elliott*, the United States Supreme Court determined when federal courts should give preclusive effect to the factfindings of state administrative bodies:

[W]e hold that when a state agency "acting in a judicial capacity ... resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate," federal courts must give the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts.

*Id.* 478 U.S. at 799, 106 S.Ct. at 3226 (citation omitted). Accordingly, to give preclusive effect to the board's *findings of fact*, this court must conduct a two-step inquiry. First, the court must be satisfied that the board: (1) acted in a judicial capacity; (2) resolved disputed issues of facts before it; and (3) afforded the parties an opportunity to litigate the disputed issues. Only if the three-prong first step is satisfied shall this court attempt to determine if the courts of South Carolina would give preclusive effect to the board's factfindings.

I find that the board, in conducting Hall's dismissal hearing, acted in a judicial capacity—she was represented by counsel, all testimony was taken under oath, and the entire proceeding was recorded by a stenographic reporter. Hall, however, did not argue at the hearing that she was being dismissed for exercising her right of free speech. Further, the board did not resolve, or consider, any factual issue regarding the retaliatory action which was taken against Hall following the publication of her editorials. Accordingly, the board did not determine whether Hall had been unjustly dismissed for exercising her right of free speech. Insofar as the First Amendment is concerned, the board did not resolve any disputed issues of fact which the parties had an adequate opportunity to litigate. As such,

---

**14.** Section 59–25–460 precludes the dismissal of a teacher "unless notice specifying the cause of dismissal is first given the teacher ... and an opportunity for a hearing has been afforded the teacher."

Section 59–25–470 provides, *inter alia*, that a teacher requesting a hearing "has the privilege of being present at the hearing with counsel and of cross-examining witnesses and may offer evidence and witnesses and present any and all defenses to the charges."

Section 59–25–480 declares that the decision of the board shall be final unless the teacher, within thirty days, appeals the decision to the state circuit court.

the requirements of *Elliott* were not satisfied.

■ Even if *Elliott* applied, only administrative *factfindings* may be given preclusive effect—not the state administrative body's conclusions of law. Whether the district committed an · impermissible violation of Hall's First Amendment rights is a question of law. *Connick*, 461 U.S. at 150–54, 103 S.Ct. at 1691; *Daniels*, 801 F.2d at 689–90. The board did not make any conclusions of law. (Def.'s Ex. 56). Further, the board did not make any factual findings regarding Hall's protected speech or whether she would have been dismissed "but for" the protected speech.·

"[W]hen the issues raised and the procedures available ... are in all important respects the same as those in the District Court, *res judicata* should bar the relitigation of the claim in federal court." *Union Mfg. Co. v. Han Baek Trading Co.*, 763 F.2d 42, 45 (2nd Cir.1985) (citation omitted). The record of the hearing does not support a finding that the board addressed the First Amendment issue.[15] Absent clear evidence (of which there is none) that the board addressed Hall's First Amendment claim, this court "cannot bar the doors of the federal courthouse to those pressing a basic constitutional claim" by speculating that the board,

in reaching its conclusion, must have deliberated the constitutional issue. *O'Reilly v. County Bd. of Appeals*, 900 F.2d 789, 792 (4th Cir.1990). In *O'Reilly*, the Fourth Circuit held that a state court opinion which "made only one reference to the constitutional issue," did not preclude the plaintiff from subsequently raising the constitutional claim in federal court. *Id.* This case clearly falls within the holding of *O'Reilly* because the board's decision failed to mention, even once, the First Amendment or the Constitution. Accordingly, the doctrines of collateral estoppel and *res judicata* do not preclude Hall's First Amendment claim.[16]

### D. *Due Process*

■ Under South Carolina law, Hall had a property interest in continued employment as a teacher. *See generally* S.C.Code Ann. §§ 59–25–410 to –530 (Law.Co-op.1990). As such, she was entitled to, and received, a pretermination hearing. Hall, however, contends that the hearing failed to comport with principles of Due Process as set forth in the Fourteenth Amendment of the United States Constitution. Hall argues that the hearing was inherently unfair because it was conducted by a biased tribunal—a board predisposed to finding her unfit to teach.

---

15. In an attempt to argue that Hall actually litigated her free speech claim, the district pinpoints several excerpts from the hearing transcript which touch upon aspects of free speech. (Def.'s Post–Trial Br. at 7–9.) The logical implication, according to the district, is "that the Board actually and necessarily deliberated over Hall's free speech defense." (Def.'s Post–Trial Br. at 10.) However, nowhere in the board's conclusion to affirm the dismissal of Hall is the First Amendment mentioned. The board's findings and· conclusions are simply devoid of any First Amendment analysis. (Def.'s Ex. 56.) In any event, for a federal court to give preclusive effect to an unreviewed decision of a state administrative body, *Elliott* requires *actual* dispute resolution of litigated facts, not logical implications of issues "necessarily deliberated."

16. Contrary to the district's contentions, South Carolina case law does not support its *res judicata* argument. *Perry*, *Earle*, and *Bennett* all involved an employee who, *following* termination, unsuccessfully appealed his discharge to the State Grievance Committee. All three employees then brought a *subsequent* state court action

challenging the validity of the discharge. Each time, the court held that the ·doctrine of *res judicata* barred the subsequent action: *Perry*, 426 S.E.2d at 336 ("the two actions [reinstatement and breach of contract] arise out of the same facts, and seek adjudication that Perry's discharge was unwarranted."); *Bennett*, 408 S.E.2d at 231 ("the Employee has conceded that the issues before the circuit court are the same as those raised and decided before the Grievance Committee."); *Earle*, 279 S.E.2d at 616 (because Grievance Committee decided the same issue, *Earle* "is precluded from raising the validity of the discharge in a collateral action.").

In contrast, Hall brought her federal action *before* she was discharged. Moreover, she never instituted any post-termination administrative proceedings. Hall simply exercised her right to be heard *prior* to the board's ruling on her recommended dismissal. S.C.Code Ann. § 59–25–460. As discussed above, the constitutional issues were not raised in the hearing—the issues before this court are *not* the same as those raised and decided before the board. *Cf. Bennett*, 408 S.E.2d at 231. Accordingly, the S.C. cases are not controlling.

The district contends that Hall's allegations of bias are based solely upon the fact that the board, pre-hearing, received numerous memoranda containing negative comments about Hall. The district argues that the mere fact that the board received memoranda addressing the Hall problem does not automatically disqualify the board as an objective decisionmaker. In light of this court's holding that the district is subject to municipal liability for discharging Hall, I find it is unnecessary to address the Due Process question. This issue does not appear essential to a resolution of this case.

## CONCLUSION

For the foregoing reasons, this court concludes that the actions of the defendant in transferring and later dismissing the plaintiff violated the plaintiff's constitutional rights under the First Amendment of the United States Constitution. Judgment will be for the plaintiff.

**THEREFORE, IT IS ORDERED** that the defendant reinstate the plaintiff to her teaching position;

**IT IS FURTHER ORDERED** that the defendant pay damages to the plaintiff in an amount equaling the sum of her lost wages and benefits as calculated by the district's teacher pay schedule;

**IT IS FURTHER ORDERED** that the defendant reimburse the plaintiff for her costs and reasonable attorney fees incurred in maintaining this action. The plaintiff is directed to provide the defendant an accounting of her attorney fees and costs within thirty days of entry of this order. The court shall provide the parties an additional thirty days to reach an agreement on the matter of attorney fees. If no agreement is reached at that time, the plaintiff may petition this court for an award of attorney fees.

**IT IS SO ORDERED.**