**Eric Q. CARROLL, Plaintiff,**

v.

**CITY OF WESTMINSTER, et al., Defendants.**

**No. Civ.A. MJG–94–2634.**

United States District Court, D. Maryland.

March 22, 1999.

548

Brian L. Wallace, Baltimore, Maryland and David L. Moore, Baltimore, Maryland, for plaintiff.

Niccolo N. Donzella and Niccolo N. Donzella, P.A., Baltimore, Maryland; and Daniel Karp and Allen, Johnson, Alexander and Karp, Baltimore, Maryland, for defendants.

GARBIS, District Judge.

The Court has before it the Motion of Defendants City of Westminster and Chief Sam Leppo for Summary Judgment, Defendant Middleton's Motion to Dismiss, or in the Alternative, for Summary Judgment, Plaintiff's Motion for Partial Summary Judgment, and the materials submitted by the parties relating thereto. The Court finds that a hearing is unnecessary.

As discussed herein, this case presents the question whether Defendants City of Westminster ("Westminster"), Westminster Police Chief Sam Leppo ("Leppo"), and John W. Middleton, M.D. ("Dr.Middleton"), violated the Constitutional rights [1] of Plaintiff Eric Carroll ("Plaintiff" or "Carroll"), a Westminster police officer, when they obtained a urine specimen from him without informing him that the specimen would be tested for the presence of narcotics. The record may present evidence that could permit a finding that Dr. Middleton may not have used due care in his handling of Plaintiff's urine specimen.[2] But, Plaintiff has failed to establish that there is a genuine issue of material fact as to whether Defendants conducted an unreasonable search of Carroll in violation of his Fourth Amendment rights. Accordingly, the instant case, based solely on constitutional

---

1. Carroll chose not to proceed on his claim based on the negligence of Dr. Middleton, presumably due to the apparent absence of any damages proximately caused by the alleged negligence.

2. i.e. was negligent.

violations and defamation claims, must be dismissed.

## I. FACTUAL BACKGROUND[3]

### A. Plaintiff's Employment

From August 23, 1990 until his termination on December 20, 1993 because of a positive drug test result, Carroll worked as a Westminster police officer[4] in Carroll County, Maryland. At all times relevant to the case, the Westminster Police Department was under the command of Chief Leppo. Plaintiff was the first African-American to serve as a uniformed officer in the Westminster Police Department. At the time Carroll was hired, Westminster had a policy that required all newly-hired police officers to sign a drug test waiver. Carroll, therefore, executed a drug testing waiver stating:

> As a condition of employment with the Westminster Police Department, the undersigned employee agree's [sic] that the Police Department may at anytime [sic], with or without cause, require tests relating to the use of any drugs; such tests to include, but not be limited to chemical tests, urinalysis, polygraph, etc.; within the condition as a perquisite [sic] to employment with the Westminster Police Department.

Plaintiff's Motion for Partial Summary Judgment ("Pl.Mot.Summ.J.") Ex. A.

During his employment, Carroll received satisfactory ratings and was recommended to receive salary increases. Leppo Dep. at 17–22. Carroll received the Officer of the Month Award on two occasions, as well as other letters and certificates of recognition for his work. Leppo Dep. at 26, 30–31; Pl.Mot.Summ.J.Exs. 2–I, 2–B, and 2–3. However, Carroll received discipline on six occasions for infractions committed while working as a Westminster police officer.[5] Motion of Defendants City of Westminster and Chief Sam Leppo ("Defs.Mot.Summ.J.") Ex. E.

### B. Events Leading Up to Carroll's Drug Test

During his May 9, 1993 work shift, Carroll drove himself to a hospital emergency room complaining that he had "tightness of the chest" and was "feeling really tired." Carroll Dep. at 123. Carroll was told that his blood pressure was very high and that he should seek follow-up treatment with his personal physician. Id. After leaving the hospital, Plaintiff continued his tour of duty, and the next day, May 10, went to see Dr. Middleton. Id. at 124. Dr. Middleton, who is retained by the Westminster police department to perform pre-employment and fitness for duty physicals[6], had seen Plaintiff on one prior occasion,[7] when he reported for an employment-related physical. Carroll Dep. at 118, 124. During the May 10 visit, Dr. Middleton took Carroll's medical history, performed a physical examination, and prescribed medication. Dr. Middleton also placed Carroll on disability for three days and advised

---

3. The facts as stated herein are presented in the light most favorable to the Plaintiff.

4. For the first two years of his employment, Carroll was a probationary officer. Because Carroll successfully completed the two year probationary period, Defendant Leppo promoted Carroll from probationary officer to Patrolman First Class on August 20, 1992. Leppo Dep. at 15–17. At all times during his employment, Plaintiff was authorized to carry a firearm.

5. Plaintiff objects to Defendants pointing to these facts because they "are outside the record developed from the parties' depositions."

Plaintiff's Response to the Motions for Summary Judgment by Defendants City of Westminster, Leppo and Middleton at 1 & n. 1. Although the facts must viewed in light most favorable to Plaintiff in resolving a motion for summary judgment, Federal Rule of Civil Procedure 56(c) does not preclude the Defendants from relying upon, or the Court from considering, facts that come from evidentiary sources other than depositions.

6. Leppo Dep. at 10. These physicals require drug and alcohol testing of the new hire. Id.

7. September 22, 1992. Defs.Mot.Summ.J.Ex. H at 93.

Plaintiff to return in three days for a follow-up visit. Carroll Dep. at 125–26.

On May 12, 1993,[8] Plaintiff returned to Dr. Middleton's office because he was still not feeling well.[9] Pl.Dep. at 126–27; Middleton Dep. at 37–38. Before Carroll arrived at Middleton's office, however, Leppo received a tip that Plaintiff was using drugs. Based on the information provided by the tipper, Leppo called Dr. Middleton and told him to perform a urinalysis on Plaintiff.

### C. The Tip

At approximately 8 a.m. on May 12, Leppo received a phone call from a person claiming that Carroll was using illegal drugs.[10] Leppo Dep. at 58–59.[11] Leppo then asked the caller to identify himself. Id. at 59. The caller identified himself as Alphonso McNeil and informed Leppo that he had known Plaintiff for 12–13 years. Id. McNeil then told Leppo that, at that very moment, Carroll was out on sick leave. Id. at 60. Leppo immediately

checked the schedule and, with the assistance of his secretary, determined that Plaintiff was in fact out on sick leave. Id. Leppo also determined that Plaintiff "was off for several days. He may have been on a two or three day break. The sick leave may have been in conjunction with that." Id. at 61. Leppo also noted that "Eric had established a record of sick leave abuse. In fact, he had been written up for excessive use of sick leave." Id. at 60. Leppo then asked McNeil for a telephone number "because if he was going to make these allegations we need to do an investigation." Id. at 61. Leppo then called the work telephone number which McNeil had given him and verified that McNeil was employed there. Id.

### D. May 12th Specimen Collection

Having verified McNeil's information (to the extent possible), Leppo contacted Dr. Middleton and told him to "do a drug and alcohol test on Mr. Carroll when he came in." Id. at 64.[12] Dr. Middleton then asked

8. One day earlier than Middleton had told Carroll to return. Carroll Dep. at 126. Plaintiff did not have an appointment for this visit. Id. at 130–131.

9. Leppo contends that Plaintiff returned to Middleton's office on May 12, 1993 because he (Leppo) directed Plaintiff to return to Middleton's office to obtain a disability certificate to return to work. Leppo Dep. at 62. At his deposition, Middleton testified that Plaintiff returned to his office on May 12 at Leppo's direction. Middleton Dep. at 73. At the administrative hearing conducted in this matter, however, Middleton stated that Plaintiff returned to his office "for a scheduled blood pressure checkup." Defs.Mot.Summ.J.Ex. H at 96, but see Middleton Dep. at 88–90. Although the parties offer different reasons as to why Plaintiff returned to Middleton's office on the morning of May 12, the fact that Plaintiff went there is not in dispute.

10. More precisely, the tipper told Leppo that "I have seen him [Plaintiff] coming down from his high." Leppo Dep. at 77.

11. This was the second such phone call Leppo had received. On December 17, 1992, Melvin Diggs, Chief of the Taneytown Police Department, called Leppo and informed him that a

person who had just been arrested in Taneytown stated that an African–American City of Westminster police officer was using illegal drugs. At the time of Diggs' call, Plaintiff was the sole African–American member of the Westminster police force. Leppo asked Diggs to provide him with the arrestee's name so that he could investigate the allegation and Diggs agreed to obtain that information for him. Leppo took no investigative steps while he awaited information from Diggs, which he never received. Therefore, the December 17, 1992 allegation was never investigated.

12. Leppo and Dr. Middleton characterize the exchange differently. Dr. Middleton asserts that he was acting as the police department physician and was required to follow Leppo's order. Dr. Middleton further asserts that he relied in good faith on Leppo's representation that he did not need to inform Plaintiff about the urinalysis because of the waiver, which was signed by all officers, that states that they are subject to drug testing at any time, with or without cause. Leppo, however, suggests that the two discussed the situation and that he did not give an order to Dr. Middleton. Regardless of whether Dr. Middleton was acting in good faith to carry out an order, it is undisputed that Leppo and Dr. Middleton had a conversation before Carroll's arrival at Dr.

Leppo whether he should inform Plaintiff that his urine would be screened for drugs. Leppo responded that it wasn't necessary to inform Carroll because Carroll had signed a drug testing waiver. Middleton Dep. at 73–74; Leppo Dep. at 65. Dr. Middleton then noted in Plaintiff's chart that "Chief Leppo called and informed me patient had an eyewitness of his use of heroin, and I asked—and asked that I obtain a urine specimen without patient's knowledge for drug screening." ·Middleton Dep. at 37 (reading Plaintiff's medical chart).

When Carroll arrived at Dr. Middleton's office, the physician examined Carroll and informed him that, in light of his high blood pressure, his urine would be tested for the presence of blood. Dr. Middleton told Carroll that he performed the "dip test" and that no blood was present in his urine. Carroll Dep. at 133.[13] Then, without Carroll's knowledge, Dr. Middleton, or his nurse, Faye Decker, transferred the specimen to a plastic cup to be sent to a City-retained lab[14] for drug testing.[15] Approximately two weeks after the specimen was taken for drug testing, Leppo received the lab's report, which indicated that the sample tested positive for codeine and morphine, indicating heroin use. Defs. Mot.Summ.J.Ex. I.

On May 25, 1993 Leppo ordered Lieutenant Dan Brewer ("Brewer"), a member of the Department's Internal Affairs Division, to meet with Carroll to inform him that he had failed a drug test and, consequently, that he was suspended.[16] On May 27, 1993, Brewer accompanied Carroll to Dr. Middleton's office to provide a second urine specimen for drug testing.[17] Carroll Dep. at 64. At Dr. Middleton's office, Carroll was told to provide the urine specimen in two separate containers, which he protested because he believed it was being done to render the second test ineffective. Plaintiff Dep. at 65–67; 70–71. Brewer then drove Carroll to the Baltimore County Police Department in Towson, Maryland for a polygraph test,[18] which was administered by Milton Duckworth of the Baltimore County Police Department. Upon completion of the test, Duckworth advised Carroll that he had failed. Defs.Mot.Ex. J at 46. Carroll volunteered that he had a brother who had a drug problem. Id. at 47. Duckworth repeatedly advised Carroll that he was under no obligation to talk to him. Id. Duckworth suggested that he invite Brewer into the room, and Carroll agreed. When Brewer arrived, Carroll stated that he had caught his brother using heroin and that he "grabbed the drugs by [his] hands ... and destroyed them ... and this was just the other day." Id. at 50. Carroll also stated that "around the

Middleton's office on May 12, 1993 which resulted in Carroll's urine being tested for the presence of narcotics without Carroll's knowledge.

13. Dr. Middleton testified at both the LEOBR hearing and at deposition that he had, in fact, tested Plaintiff's urine for the presence of blood. Defs.Mot.Ex. H at 99; Middleton Dep. at 84.

14. CompuChem, a subsidary of Roche Medical Laboratories, which is located in North Carolina.

15. At his deposition, Dr. Middleton testified that he handed Plaintiff's urine specimen, which was in a paper Dixie cup, to his nurse for drug screen processing, which would include transfer of the specimen to a plastic cup. Middleton Dep. at 65–68. At the Board

hearing, however, Dr. Middleton's nurse testified that she received the urine specimen already in the plastic cup. Dr. Middleton explained the discrepancy as "a small detail" because he knew that he had "passed the specimen directly to her, in whatever container it was in." Middleton Dep. at 67–68.

16. Except for his post-polygraph statement to Brewer that his specimen tested positive because he had handled heroin around the time of his first drug test, Plaintiff has consistently maintained that the specimen that tested positive for heroin use was not his. Carroll Dep. at 51–52.

17. The results of the second urinalysis test were inconclusive.

18. Plaintiff requested the test. Leppo Dep. at 89.

12th back a couple of weeks ago when I went for the physical I did the same thing." Moreover, Carroll told Brewer that "I didn't tell him [presumably either Duckworth or Middleton] that and I should have." *Id.* As described more fully below, Carroll was ultimately terminated as a result of the positive drug test.

## II. *PROCEDURAL BACKGROUND*

On July 14, 1993, Carroll received a copy of the notification of the charges made against him. Defs. Ex. L at 3. On December 2, 1993, a hearing board convened pursuant to the Law Enforcement Officer's Bill of Rights ("LEOBR") to consider the thirty charges pending against Carroll and to recommend what, if any, disciplinary action Leppo should take against Carroll. The LEOBR Board found Carroll guilty of seven charges and recommended termination as the appropriate remedy on each count. On December 20, 1993, Leppo informed Carroll that he had accepted the Board's recommendation. Defs. Mot.Summ.J.Ex. M. Although Maryland law provides law enforcement officers with an appeal as of right from an LEOBR hearing board determination in the circuit court in which the hearing was held, Plaintiff did not appeal the Board's findings. *See* Md.Code Ann.Art. 27 § 732; Defs. Mot.Summ.J. at 12.

On September 27, 1994, Plaintiff filed the instant action. On March 14, 1995, the Court dismissed the negligence claims (Counts III, IV, VI and VII) on the grounds that they were covered by the Health Claims Arbitration Act. On April 3, 1995, the Court stayed proceedings on the Constitutional and defamation claims (Counts I, II, and V) pending resolution by the Health Claims Arbitration Panel and set December 31, 1996 as the deadline for reopening the case. On May 6, 1997, Plaintiff requested that the Court lift the April 3, 1995 stay as to the Constitutional and defamation claims because he opted not to pursue the negligence claims in any forum. On August 25, 1997, the Court lifted the stay, dismissing with prejudice the negligence claims and reactivating the Constitutional and defamation claims.[19]

On May 4, 1998, after full discovery, all parties filed dispositive motions in this action: Plaintiff filed a Motion for Partial Summary Judgment[20], Defendants City and Leppo moved for summary judgment as to all remaining counts (Counts I, II, and V), and Defendant Middleton filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, as to all remaining claims.

## III. *LEGAL STANDARDS*

The motions before the Court present claims for dismissal and for summary judgment. Accordingly, the standards as to each type of motion are pertinent to this discussion.

### A. *Motions to Dismiss*

The Court must deny a Motion to Dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure unless it "appears beyond doubt that Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "The question is whether in the light most favorable to the Plaintiff, and with every doubt resolved in his behalf, the

---

**19.** The Court concluded that "Plaintiff's April 5, 1995 letter stating an intent to relinquish counts 3, 4, 6, and 7 got lost in the shuffle sufficiently to warrant excusing Plaintiff from the December 31, 1996[ ] deadline in the April 3, 1995[ ] Order." August 25, 1997 Memorandum & Order. the Court further stated that Plaintiff's failure to clarify the status of his April 5, 1995 letter constituted "[a]t the very worst ... excusable neglect." *Id.*

Moreover, the Court concluded that Defendants had not been genuinely prejudiced by the delay and that the December 31, 1996 was not "a fixed statute of limitations" but rather a "Court-selected deadline which, while significant, can be changed." *Id.*

**20.** Plaintiff's motion seeks summary judgment as to all remaining claims.

Complaint states any valid claim for relief." 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure: Civil 2d, § 1357, at 336. The Court, when deciding a motion to dismiss, must consider well-pled allegations in a complaint as true and must construe those allegations in favor of the plaintiff. *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Jenkins v. McKeithen,* 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969). The Court must further disregard the contrary allegations of the opposing party. *A.S. Abell Co. v. Chell,* 412 F.2d 712, 715 (4th Cir.1969).

### B. *Summary Judgment Motions*

A motion for summary judgment shall be granted if the pleadings and supporting documents "show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The well established principles pertinent to such motions can be distilled to a simple statement.

The Court must look at the evidence presented in regard to the motion for summary judgment through the non-movant's rose colored glasses, but must view it realistically. After so doing, the essential question is whether a reasonable fact finder could return a verdict for the non-movant or whether the movant would, at trial, be entitled to judgment as a matter of law. *E.g. Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Shealy v. Winston,* 929 F.2d 1009, 1012 (4th Cir.1991).

In this case, no party contends that there is any genuine issue of material fact with respect to the § 1983, § 1985, or defamation causes of action. Accordingly, disposition on summary judgment is appropriate.

### C. *Consideration of Matters Outside the Pleadings*

Under Rule 12(b)(6), on a motions seeking dismissal, "if matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." Fed.R.Civ.Pro. 12(b)(6).

### D. *Conversion of Middleton's Motion to Dismiss*

Defendant Middleton's motion shall be treated as one for summary judgment because he alleges a lack of legally sufficient evidence to support Plaintiff's claims. He never suggests that Plaintiff has not pleaded a claim upon which relief could be granted. Moreover, the parties engaged in full discovery prior to the filing of Dr. Middleton's motion and attached materials outside the pleadings to their motions. Finally, it appears that Carroll, in addition to filing his own motion for summary judgment, treated Defendant Middleton's motion as one for summary judgment.

## IV. *DISCUSSION*

### A. *Count I—Section 1983 Action*

Carroll brings this 42 U.S.C. § 1983 action based upon violation of his Fourth and Fourteenth Amendment rights. Essentially, Carroll alleges that Defendants violated his Fourth Amendment rights by subjecting him to urinalysis pursuant to an unconstitutional drug testing policy and by performing drug testing on him in an unconstitutional manner. Carroll further maintains that because he was terminated from his employment as a result of constitutionally infirm test results, Defendants have deprived him of substantive due process and liberty interests in violation of the Fourteenth Amendment.

#### 1. *The LEOBR Board Resolution is Not Conclusive*

As a threshold matter, Defendants contend that, under *University of Tennessee v. Elliott,* 478 U.S. 788, 106 S.Ct. 3220, 92

L.Ed.2d 635 (1986), they are entitled to summary judgment as to all factual matters that were resolved in their favor by the LEOBR Board. Defendants further contend that *Layne v. Campbell County Department of Social Services*, 939 F.2d 217 (4th Cir.1991), forecloses Carroll's opportunity to relitigate the issues decided by the LEOBR Board because: (1) Carroll was represented by counsel at the LEOBR hearing and had the right to call, examine, and cross-examine witnesses, City Defs. Mem.Summ.J. at 17; (2) the Board made findings that addressed Carroll's constitutional challenges to the drug test and were supported by substantial evidence, *Id.* at 17–18; and (3) when preclusive effect is given to the Board's findings, Carroll is unable to prove his claims. *Id.* at 19.

Carroll responds that he "has not brought an action seeking review of the trial board findings because he did not have an adequate opportunity to litigate before the board. To the contrary, Carroll alleges that his termination, based on the Board's fact findings, violated his Fourth and Fourteenth Amendment rights and was an error of law. Carroll's opportunity to litigate this issue is not, therefore, precluded by the fact finding of the trial board proceeding." Pl.Resp. at 5.

*Hall v. Marion School Dist. No. 2*, 860 F.Supp. 278 (D.S.C.1993) *aff'd* 31 F.3d 183 (4th Cir.1994), is instructive. In *Hall*, a teacher brought a § 1983 action against a public school district as a result of her termination for exercise of her First Amendment rights. In analyzing whether the plaintiff should be collaterally estopped from litigating her First Amendment claim (that served as the basis of the § 1983 action), the Fourth Circuit noted that 28 U.S.C. § 1738 requires federal courts to give state court judgments the same issue and claim preclusive effect in subsequent 1983 actions as they would be entitled in the state court. *Hall*, 31 F.3d at 190. The Fourth Circuit then noted that, because Plaintiff had not appealed the administrative decision to the state court, it was presented with an unreviewed state administrative decision that the plaintiff should be fired. *Id.* at 191. Therefore, the Fourth Circuit concluded, "federal common law rules of preclusion, as outlined by [*University of Tennessee v.] Elliott*, 478 U.S. 788, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986), control." *Id.*

This reasoning is equally applicable to the instant case. Like the plaintiff in *Hall*, Carroll had two options for review of the Board's recommendation that his employment be terminated. First, Carroll could have appealed the Board's decision to the Circuit Court for Carroll County, and if he lost, he could have appealed that determination to the Maryland Court of Special Appeals. Md.Code Ann. Art. 27 § 732 (Michie1996). It is clear that had Carroll taken the state court route, the final decision of the Court of Special Appeals would have both issue and claim preclusive effect in federal court. The second option available to Carroll, which he pursued, was to file a claim in federal court, which may be done without appealing the Board's decision in state court. *Patsy v. Board of Regents*, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982); *Hall*, 31 F.3d at 191. Therefore, instead of a state court decision upholding the employment termination, this Court, like the Fourth Circuit in *Hall*, is presented with an unreviewed state administrative decision that Carroll should be fired. Therefore, under the rationale of *Hall*, *Elliott* is applicable to this case.

In *Elliott*, the Supreme Court set forth the test for determining whether a federal court should give preclusive effect to the unreviewed factual findings of an administrative body: "When a state agency acting in a judicial capacity . . . resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, federal courts must the agency's factfinding the same preclusive effect to which it would be entitled in the State's courts." *Hall*, 31 F.3d at 191, quoting *Elliott*, 478 U.S. at 799, 106 S.Ct. 3220.

(internal quotations omitted). Moreover, "[i]f these requirements of the Elliott test are not satisfied, 'federal courts are not required to give preclusive effect to the state agency's factfinding,' even if such findings would be given preclusive effect in the State's courts." *Hall,* 31 F.3d at 191 quoting *Layne,* 939 F.2d at 221 n. 13.

■ The Court's first inquiry, therefore, is to determine whether, in the instant case, the Board acted in a judicial capacity. It is undisputed that Plaintiff was represented by counsel, presented evidence, and that testimony was taken under oath and recorded. Moreover, unlike *Hall,* there is no evidence, or even a contention, that the Board failed to act impartially in determining what, if any, disciplinary action Leppo should take against Plaintiff. Therefore, the Court concludes that the first prong of the *Elliott* test, that the Board have acted in a judicial capacity, has been satisfied.

■ Having concluded that the Board acted in a judicial capacity, the Court must determine whether the parties had "an adequate opportunity to litigate." *Layne,* 939 F.2d at 219. The Court has reviewed the hearing Board's report and notes that it focuses solely on whether Carroll's lack of knowledge of the test or the provision of the specimen into a Dixie cup affected the scientific validity of the test result. The Board considered only whether Carroll should be disciplined *given* the results presented to them. Therefore, the Court agrees with Carroll's contention that "[t]he [t]rial [b]oard's findings of fact are conspicuously silent regarding consideration of *any* constitutional issues. Indeed, the

trial board made *no* conclusions of law." Therefore, Plaintiff is not precluded form litigating his constitutional deprivation claims in this Court.

### 2. Fourth Amendment (Fourteenth Amendment) [21] Claims

Plaintiff alleges that, on its face, Defendants' drug testing policy violated his Constitutional rights because "Defendant City of Westminster, has, through the action of its Chief of Police, Defendant Leppo, implemented a policy of workplace drug testing within the Police Department that is unconstitutional." Compl. ¶ 27. Carroll alleges that the policy violated his rights as applied to him because "Defendant Leppo, by instructing Dr. Middleton to obtain Plaintiff's urine specimen and submit it for drug testing in this manner, ["specimen obtained under some deception and submitted for laboratory testing in secret", Compl. 31] caused Carroll to be subjected to an unreasonable search and seizure in violation of the Fourth Amendment." Compl. at ¶ 32.

### a. Review of Relevant Case Law

The United States Supreme Court has addressed the constitutionality of workplace-related drug testing in *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) and *Skinner v. Railway Labor Executives' Association,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989). The United States Court of Appeals for the Fourth Circuit has addressed this issue in one published decision [22], *Thomson v. Marsh,* 884 F.2d 113 (4th Cir.1989).

---

**21.** Technically, Plaintiff cannot base his § 1983 action against the City of Westminster and Leppo on a "Fourth Amendment" action because none of the Defendants are *federal* governmental actors. Rather, Plaintiff's action is more properly stated as one that rests on the Fourth Amendment *as incorporated by* the Fourteenth Amendment. This technical error, however, does not require dismissal of the action, as it is apparent that the Fourth Amendment label did not affect the parties' respective treatment of the claims. Moreover, Plaintiff's Complaint cannot be said to

have violated the notice pleading requirements of Fed.R.Civ.P. 8. In the interest of clarity, the claim will be referred to herein as a "Fourth Amendment" claim.

**22.** The Fourth Circuit considered this issue again in a recent unpublished decision, *Roberts v. City of Newport News,* 36 F.3d 1093, 1994 WL 520948 (4th Cir.1994) (per curiam). In *Roberts,* the Fourth Circuit held that "[r]egardless of whether any drug testing program is in place, a government employer may require an employee to submit to urinalysis

In *Skinner*, a group of railway labor organizations challenged the constitutionality of the Federal Railroad Administration's ("FRA") regulations that mandate blood and urine tests of employees [23] who are involved in certain "triggering events."[24] In *Von Raab*, a union of United States Customs Service employees brought a constitutional challenge to the Custom Services' drug testing program that required urinalysis specimens of employees who applied for or sought transfer or promotion to positions involving interdiction of illegal drugs, the carrying of a firearm, or the carrying od classified material. In both cases, the Supreme Court held that the random drug testing programs at issue were constitutional because the employers in both cases demonstrated that "important governmental interests outweigh[ed] individuals' expectations of privacy." *Thomson*, 884 F.2d at 114.

In *Skinner*, the Supreme Court found that the "governmental interest in ensuring the safety of the traveling public and of the employees themselves plainly justifies prohibiting covered employees from using alcohol and drugs on duty, or while subject to being called for duty." *Skinner*, 489 U.S. at 621, 109 S.Ct. 1402. Moreover, the Supreme Court stated, "[t]his interest also 'requires and justifies the exercise of supervision to assure that the restrictions are in fact observed.'" *Id. quoting Griffin v. Wisconsin*, 483 U.S. at 875, 107 S.Ct. 3164. The Supreme Court also concluded that "the expectations of covered employees are diminished by reason of their participation in an industry that is regulated pervasively to ensure safety, a goal dependent, in substantial part, on the health and fitness of covered employees." *Id.* at 627, 109 S.Ct. 1402. In *Von Raab*, the Supreme Court observed that the Government has a compelling interest "in ensuring that front-line interdiction personnel are physically fit, and have unimpeachable integrity and judgment." The Supreme Court also concluded that the Government's interests "outweigh the privacy expectations of employees who seek to be promoted to positions that directly involve the interdiction of illegal drugs or that require the incumbent to carry a firearm.

Significantly, although the Supreme Court mentioned features of each drug testing program that, when taken together, rendered them constitutional,[25] the Supreme Court has not pointed to any one factor that must be present in order for a drug testing program to be constitutional.

Finally, in *Thomson*, civilian employees of the United States Army challenged the constitutionality of the Army's requirement that employees whose work involves chemical weapons submit to random drug tests. *Thomson*, 884 F.2d at 114. The Fourth Circuit upheld the random drug testing program because "the governmental interest in safety at Aberdeen clearly outweighs plaintiffs' expectation of privacy[.]" *Id.* at 115.

### b. *Violations Asserted by Plaintiff*

Carroll asserts that Defendants violated his Fourth Amendment right to be free from unreasonable searches because both Defendants' drug testing policy and the drug test that was performed on his urine specimen were unconstitutional. Carroll

where the employer has reasonable, articulable grounds to suspect an employee of illegal drug involvement. This would require individualized suspicion, specifically directed to the person who is targeted for the urinalysis test."

23. "Employees" refers to employees of the federal government, or of a private employer who was subject to the FRA's extensive regulations, who are covered by the Hours of Service Act.

24. Such as train accidents.

25. Such as, *inter alia*, limited discretion of supervisors as to who takes a test, diminished expectation of privacy on the part of employees subject to random testing, and written regulations governing the handling of specimens.

asserts that: (1) the Defendants' drug testing policy does not qualify for the exception *Skinner* and *Von Raab* established for random, suspicionless drug testing; and (2) that the Defendants lacked individualized suspicion to test Carroll specifically.

Defendants disagree, maintaining that their random, suspicionless drug testing program meets the constitutional requirements set forth in *Skinner* and *Von Raab*, and that even if it did not, they had individualized suspicion to test Carroll's urine for the presence of narcotics.

Therefore, as Carroll has alleged, Defendants' conduct in the instant case was unconstitutional unless: (1) its departmental drug test policy meets the *Skinner–Von Raab* exception for random, suspicionless drug testing; or (2) Defendants had individualized suspicion to test Plaintiff's urine for the presence of narcotics.

### 1. *Defendants' Drug Testing Policy*

Defendants' policy qualifies for the exception to the warrant requirement that allows random drug testing if Westminster's need to monitor compliance with the restrictions on narcotics outweighs the privacy intrusion at issue absent probable cause. The City of Westminster and its police department set forth its drug policy in a municipal resolution that expressly left it to the Chief of Police to adopt a drug testing program for law enforcement. Pl.Mot.Summ.J. Ex. A6.

■ Westminster's substantial interests in insuring that its police officers are drug free clearly justifies departure from the warrant or individualized suspicion requirement necessary to conduct a Fourth Amendment search. The reasons set forth in that resolution are consistent with the purposes for which the Supreme Court approved random drug testing in *Von Raab* and *Skinner*. As the Supreme Court stated in *Skinner*, 489 U.S. at 632, 109 S.Ct. 1402, "[t]he possession of unlawful drugs is a criminal offense that the

Government may punish, but it is a separate and far more dangerous wrong to perform certain sensitive tasks while under the influence of those substances." *Id.* Furthermore, like the Customs officers in *Von Raab*, armed police officers "discharge duties fraught with such risks of injury that to others that even a momentary lapse of attention can have disastrous consequences." *Von Raab*, 489 U.S. at 670, 109 S.Ct. 1384 (internal quotations and citations omitted). Moreover, "the public should not bear the risk that employees who may suffer from impaired perception and judgment will be promoted to positions that they may need to use deadly force. Indeed, ensuring against the creation of this dangerous risk will itself further Fourth Amendment values, as the use of deadly force may violate the Fourth Amendment in some circumstances." *Id.* at 671, 109 S.Ct. 1384 *citing Tennessee v. Garner*, 471 U.S. 1, 7–12, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985).

Carroll contends that Westminster's drug testing program lacks one of the main features that caused the Supreme Court to approve the programs in *Skinner* and *Von Raab*: that the employer had adopted Department of Health and Human Services Regulations ("HHS") guidelines on specimen collection. Moreover, Carroll contends, Defendants have not adopted any written guidelines on specimen collection and testing procedures.

That Defendants in the instant case did not adopt HHS procedures (Compl. at 28), or even State of Maryland Department of Personnel regulations [26] (Compl.29), is of no moment. Neither *Von Raab* nor *Skinner* requires the adoption of HHS guidelines, or comparable state guidelines, for a testing program to be reasonable. Furthermore, the undisputed evidence indicates that CompuChem, the lab with which the Department contracted, had written procedures for specimen collections. Middleton Dep. at 55–56. Moreover, Dr. Mid-

---

**26.** COMAR 06.01.09.01 *et. seq.*

dleton and his nurse received in-service training from Roche Labs with regard to maintaining chain of custody of urine specimens. *Id.* Carroll has failed to set forth any evidence establishing that Roche Labs did not have specimen collection and handling procedures, that Dr. Middleton was not trained in them, or that the procedures themselves were constitutionally defective under *Skinner* and *Von Raab.* Accordingly, Westminster's drug testing policy is not unconstitutional on its face.

### 2. Carroll's Drug Test

Having concluded that Defendants' drug policy was not unconstitutional, the Court must now consider whether the drug test performed on Carroll's urine specimen was unconstitutional. Essentially, Carroll contends that the drug test performed on him was unconstitutional because: (1) Defendants lacked a basis for testing him; (2) Dr. Middleton did not adequately safeguard his sample such that a constitutional chain of custody was established; and (3) the specimen was obtained without his knowledge that it would be submitted for urinalysis.

### a. Basis for Drug Test: Reasonable Suspicion

The Court has concluded that Defendants' drug testing policy was constitutional. Therefore, Plaintiff could have been constitutionally tested pursuant to it without any suspicion at all. Even if the Court had concluded that Westminster's policy were unconstitutional, Plaintiff's test was constitutionally administered if Defendants had a reasonable, articulable suspicion that Carroll was using drugs. *See Roberts v. City of Newport News,* 36 F.3d 1093, 1994 WL 520948 (4th Cir.1994) (per curiam) (unpublished decision).

■ Defendants maintain that they had individualized suspicion to test Carroll based upon the information that they received in two telephone calls. The first call, from Chief Melvin Diggs of the Taneytown Police Department, in December of 1992, informing Leppo that an arrestee had stated that an African–American police officer in Westminster was using drugs, lacked sufficient detail and reliability to constitute individualized suspicion that Plaintiff was involved in illegal drugs. The second call, however, from Alphonso McNeil,[27] carried the requisite indicia of reliability, as many of the facts that could be verified in fact were prior to Leppo's call to Dr. Middleton asking that he obtain a urine specimen for drug testing on Plaintiff's urine.

The Court concludes that based on the information obtained (and, to the extent possible, verified) by Leppo constituted a reasonable, individualized suspicion that Carroll could be involved with illegal drugs. Hence, there was a proper basis for the drug test at issue.

### b. Chain of Custody

Carroll contends that Dr. Middleton did not establish a constitutionally sound chain of custody such that the specimen that produced the positive drug result can be said to be the one that he provided in Dr. Middleton's office. Specifically, Carroll testified that his sample was mishandled because "when I first urinated into a Dixie cup for it to be in a Dixie cup, that's [not] the proper container that you would urinate in for it to be sent out to a lab." Carroll Dep. at 94–95. Carroll's other evidence of mishandling is that upon "leaving the office, [I saw] the same Dixie cup with urine in [Middleton's] lab on the counter unattended." *Id.*

27. Carroll concedes that he knows McNeil, but contends that he and McNeil had fought days prior to McNeil's telephone call to police. Carroll Dep. at 20–26. In so stating, Carroll is attempting either to demonstrate that McNeil would have little knowledge of his routine or to discredit McNeil by ascribing to him an improper motive to lie (revenge).

Whether McNeil had an ulterior motive in calling Leppo does not change the fact that his information, coupled with the telephone call from Diggs and the pattern of sick leave abuse, gave Leppo reasonable suspicion to believe that Carroll was involved with drugs and therefore order a urinalysis.

Carroll contends that these actions violated his Constitutional rights because the testing programs approved in *Von Raab* and *Skinner* had written guidelines to avoid the type of actions that Dr. Middleton took. To the extent that there is evidence establishing that Dr. Middleton departed from Roche Lab's guidelines [28] in handling Carroll's specimen, such action does not render the test result erroneous or unconstitutionally obtained. There is no doubt that whoever produced the urine specimen now identified as Carroll's was using drugs. Moreover, Carroll has not disputed the *scientific validity* of the test results. Rather, Carroll's allegation is that Defendants failed to establish a constitutionally sound chain of custody because of Dr. Middleton's transfer of the specimen from the Dixie cup to the plastic container and Plaintiff's view of the Dixie cup left unattended.

Assuming that Carroll's allegations of mishandling are true, they establish, at most, that Middleton may have been negligent in failing to follow the precise collection procedure provided by Roche Labs. Although Dr. Middleton, in obtaining Plaintiff's specimen, might have failed to use the care that a reasonable physician would have used, Dr. Middleton's alleged negligence would not render Plaintiff's drug test unconstitutional.

### c. *Failure to Give Carroll Advance Notice*

Carroll believes that his Constitutional rights were violated because Dr. Middleton obtained a urine specimen from

him without telling him that it would be tested for the presence of drugs. Although Carroll would have preferred to have been told that the urinalysis would be performed, such information was not Constitutionally required. Carroll had signed a waiver that he would submit to a drug test at any time, with or without cause. It is undisputed that if Defendants had informed Carroll of their intentions, he would have had to submit the specimen or subject himself to discipline, including termination. Moreover, Carroll testified that if Dr. Middleton had informed him that he needed a urine specimen from him for drug screening, "I would have told him no problem." Carroll Dep. at 86. Implicit in this statement is Carroll's recognition that his personal physician, Dr. Middleton, was also the police department's doctor.[29] Carroll knew when he provided the specimen that he had signed the waiver and that he was providing it to the department's doctor, regardless of whether he went to see Dr. Middleton for personal reasons or on police department business.

As Carroll testified, he understood that by signing the waiver, he "gave up [his] right as probable cause that any time they can require me to take [a urinalysis] test without cause." Carroll Dep. at 141. Signing that waiver constituted sufficient notice to Carroll that his urine could be tested at any time. Just because Carroll was tested pursuant to reasonable suspicion rather than the random drug testing program does not negate Carroll's agreement that his urine could be tested at any time. Carroll could have, and should have,

---

**28.** Dr. Middleton's confusion about whether he handed the specimen to his nurse while it was still in the Dixie cup or after he transferred it to the plastic container used to send specimens to the lab does not mean that guidelines were never created or were ignored. At most, there is an issue as to possible negligence.

**29.** Plaintiff testified that he saw Middleton on three occasions. Carroll Dep. at 17. The first was when he was sent to Middleton for an employment-related physical. *Id.* at 13–14. At that time, Plaintiff did not have a personal physician, but Middleton became his personal physician that day because he needed treatment for high blood pressure. *Id.* Plaintiff saw Middleton for a second time on May 10 because of his high blood pressure. *Id.* at 17. Plaintiff testified that he went to see Middleton because he was the police department physician that he had seen for his employment-related physical. *Id.* at 125. Plaintiff saw Middleton for the third (and final) time on May 12, when the specimen was obtained for drug testing purposes. *Id.* at 17–18.

foreseen that Dr. Middleton would or could perform a urinalysis drug test on him. For all of these reasons, Carroll's drug test was not rendered unconstitutional because he had not been given notice that it would be performed at the time that he gave his urine specimen.

### 3. *Fourteenth Amendment (against all Defendants)*

#### a. *Due Process*

Carroll asserts that when "Defendants City of Westminster and Leppo, in reliance upon a drug testing policy that was constitutionally deficient, directed Carroll's treating doctor to obtain and submit his urine to a laboratory for drug testing without his knowledge or consent. The resulting positive drug test was then used as the basis for Carroll's termination." Pl.Mot. Summ.J. at 15. Carroll asserts that such conduct violated his substantive due process rights because it amounted to governmental conduct that was "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Id. citing Jackson v. Gates,* 975 F.2d 648, 657 (9th Cir.1992).

The Due Process Clause of the Fourteenth Amendment was designed to "promote[ ] fairness" when governmental agents decide to " 'deprive any person of life, liberty, or property[.]' " *Daniels v. Williams,* 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Moreover, "by barring certain government actions regardless of the fairness of the procedures used to implement them, it serves to prevent governmental power from being used for purposes of oppression."

For the same reasons that the Court has concluded that the search of the Plaintiff was reasonable in light of the unique facts of this case,[30] the Court concludes that Plaintiff was not subjected to "clearly arbitrary and unreasonable" conduct by the government. Viewing the facts in the light most favorable to Plaintiff, Carroll has established that Dr. Middleton may not have

followed standard operating procedure in transferring the urine from the Dixie cup into the plastic container. Dr. Middleton's alleged negligence in this regard, however, is quite remote from the concerns that the Due Process Clause was meant to address. As the Supreme Court stated in *Daniels,* 474 U.S. at 331, 106 S.Ct. 662, "[f]lat from an abuse of power, lack of due care suggests no more than a failure to measure up to the conduct of a reasonable person." Moreover, even if Dr. Middleton's handling of the sample caused injury to Carroll, "to hold that [such] injury ... is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." *Id.*

Finally, assuming that Carroll has not abandoned his claim in his Complaint that his "interest in continued employment with the Police Department is protected by the Due Process Clause of the Fourteenth Amendment," Compl. at ¶ 33, Carroll has failed to establish that he was denied such an interest. Whether Carroll had a property interest in his employment is determined by reference to state law. *Jackson v. Long,* 102 F.3d 722, 728 (4th Cir.1996). Under Maryland law, any non-probationary law enforcement officer who may make arrests and is a member of the police department of any incorporated city or town and is subject to departmental discipline is entitled to the procedural protections afforded by Art. 27 § 727(b)(5), the "LEOBR". Carroll, as a non-probationary Westminster police officer, was entitled to the panoply of pre-disciplinary action due process procedures provided for in the LEOBR. It is undisputed that Carroll received the panoply of pre-termination rights the LEOBR affords to Maryland law enforcement officers. *See* Art. 27 § 730 *et. seq.* Prior to his termination, an LEOBR Board conducted a full evidentiary hearing, at which Carroll was represented by counsel. The Board found Carroll guilty of violations for which the

---

**30.** *See supra* Section (IV)(A)(2).

Board may recommend termination. The Board recommended termination, Chief Leppo accepted the Board's recommendation and informed Carroll of that fact. *See* Pl.Mot.Summ.J.Exs. A4–A5. Carroll chose to forego his appeal as of right to the Carroll County Circuit Court.

■ Maryland courts have interpreted the LEOBR as an "officer's exclusive remedy in matters of departmental discipline." *Moats v. City of Hagerstown,* 324 Md. 519, 597 A.2d 972 (1991). Maryland courts have also held that the procedural safeguards of the LEOBR do not operate to confer a property right in an officer's continued employment as a town's police officer. *Elliott v. Kupferman,* 58 Md.App. 510, 473 A.2d 960 (1984). As the Fourth Circuit stated in *Jackson v. Long,* 102 F.3d 722 (4th Cir.1996) "while the law appears to give some procedural rights ... the Board is given no right in the end to direct the [Chief] to do anything. And procedural rights in themselves do not create substantive property rights protected by the Fourteenth Amendment." *citing, inter alia, Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 541, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). Carroll has failed to point to any other source of law that grants him a property interest in his employment.[31] Therefore, Carroll was not deprived of a property interest in violation of his Fourteenth Amendment due process right and summary judgment for Defendants is appropriate.

### b. *Liberty Interest*

Carroll has moved for summary judgment as to Count I, which includes his deprivation of liberty interest claim. However Plaintiff's motion, reply to Defendants' opposition to his motion, and response to Defendants' summary judgment

motion fail to identify specific facts in evidence to establish that he was deprived of a liberty interest. *See* Defendants City's and Leppo's Opposition to Plaintiff's Motion for Partial Summary Judgment at 16.

In his Complaint, Carroll asserts that he has been denied his liberty interest in: (1) his reputation; (2) continued and/or re-employment in his chosen profession; and (3) associational and professional opportunities. Carroll bases these claims on the fact that "Defendants' accusation that Plaintiff was terminated because he tested positive for drug use has directly affected his ability to obtain employment in any other law enforcement agency." Compl. at ¶ 35.

■ Carroll claims that his professional reputation has been harmed by Defendants' actions because "statements" in his personnel file indicate that he was terminated because of the positive drug test result. As the Fourth Circuit has held, even if those statements "may have been defamatory under state law, that tort alone does not constitute a constitutional deprivation. Rather, unjustified state action must so seriously damage the plaintiff's reputation and standing in his community as to foreclose his freedom to take advantage of other economic opportunities." *Jackson,* 102 F.3d at 730 (internal citations and quotations omitted). In the instant case, even if Defendants' actions damaged Carroll's reputation, Carroll testified that he is currently earning $26,000 a year at Peabody Institute, the same salary that he earned while employed as a Westminster police officer. Carroll Dep. at 97–99. Additionally, Carroll has held at least two law enforcement positions (in which he had arrest powers) since his termination as a Westminster police officer. Carroll Dep.

---

**31.** Even if Plaintiff had identified a source for his alleged property right in his employment with the City of Westminster Police Department, the pre- and post-termination procedures that state law affords to a police officer (and which Plaintiff actually received in this case) satisfy due process. *See Loudermill,* 470

U.S. at 547–48, 105 S.Ct. 1487 (holding that a pretermination opportunity to respond, coupled with post-termination administrative procedures provides "all the process that is due" to an employee with a property interest in his job).

at 99–113. Therefore, Carroll has failed to present any evidence that he has been unable to obtain re-employment in his chosen profession or that he has been denied associational and professional opportunities as a result of Defendants' conduct in this matter.

### 3. Qualified Immunity Defense

Having concluded that the urinalysis did not violate Plaintiff's Fourth or Fourteenth Amendment rights, the Court need not consider Leppo's and Middleton's contentions that they are entitled to qualified immunity on Plaintiff's § 1983 claims.[32] See Def.Mot.Dis. at 17. Nonetheless[33], the Court has undertaken the qualified immunity analysis.

The purpose of qualified immunity is "to avoid excessive disruptions of government" by protecting "government officials performing discretionary functions from civil damage suits 'insofar as [the officials'] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" McVey, 157 F.3d at 276, quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Because the qualified immunity of government officials depends at the outset on the existence of a constitutional right, "[a] necessary concomitant to the determination of whether the constitutional right asserted by a plaintiff is 'clearly established' at the time the defendant acted is the determination of whether the plaintiff has asserted a violation of a constitutional right at all." Siegert, 500 U.S. at 232, 111 S.Ct. 1789. Thus, it is "the better approach ... to determine first whether the plaintiff has alleged a deprivation of a constitutional right at all" before turning to the question of whether the right was clearly established so that an objectively reasonable officer would have known of it. County of Sacramento v. Lewis, 523 U.S. 833, 118 S.Ct. 1708 n. 5, 140 L.Ed.2d 1043 (1998). When determining whether a reasonable official would have been aware of a constitutional right, the official is not required to sort out conflicting decisions or to resolve subtle or open issues. "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." Maciariello v. Sumner, 973 F.2d 295, 298 (4th Cir.1992).

To determine whether the right allegedly violated was clearly established at the time that it occurred, "the proper focus is not upon the right at its most general or abstract level, but at the level of its application to the specific conduct being challenged." Wiley, at 995 quoting Pritchett v. Alford, 973 F.2d 307, 312 (4th Cir.1992). In conducting the immunity inquiry, the Court looks to settled law at the time of the allegedly unconstitutional act. Robinson v. Balog, 160 F.3d 183, 187 (4th Cir.1998), citing Harlow, 457 U.S. at 818, 102 S.Ct. 2727. In order to determine settled law, the Court looks to

---

**32.** Because qualified immunity includes "an entitlement not to stand trial or face other burdens of litigation, conditioned on the resolution of the essentially legal (immunity) question," McVey v. Stacy, 157 F.3d 271, 274 (4th Cir.1998), citing Behrens v. Pelletier, 516 U.S. 299, 116 S.Ct. 834, 133 L.Ed.2d 773 (1996) and Mitchell v. Forsyth, 472 U.S. 511, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985), the Court must give the "qualified immunity defense at the dismissal stage of litigation a hard look, [or] it risks unwittingly the forfeiture of some protections afforded by that defense." McVey, 157 F.3d at 274. Therefore, the court must "review the immunity defense critically at an early stage of the proceedings to determine the legal questions of whether plaintiff has asserted a violation of a constitutional right and, if so, whether the constitutional right was clearly established at the time the defendant acted." Id. citing Siegert v. Gilley, 500 U.S. 226, 231–32, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991) and DiMeglio v. Haines, 45 F.3d 790, 795 (4th Cir.1995). In reviewing whether Defendants' are entitled to immunity, "it is [their] conduct as alleged in the complaint that is scrutinized for 'objective legal reasonableness." Behrens, 516 U.S. at 309, 116 S.Ct. 834.

**33.** For efficiency, in the event that an appellate court might decide that the matter should be addressed.

decisions "by the Supreme Court, the appropriate United States Court of Appeals, or the highest court of the state." *Wilson v. Layne,* 141 F.3d 111 (4th Cir.1998). Therefore, if there is a " 'legitimate question' as to whether an official's conduct constitutes a constitutional violation, the official is entitled to qualified immunity." *Wiley,* 14 F.3d at 995 *citing Tarantino v. Baker,* 825 F.2d 772, 775 (4th Cir.1987). In *Cromer v. Brown,* 88 F.3d 1315, 1324 (4th Cir.1996), the Fourth Circuit observed that "[t]he purpose of the qualified immunity defense under § 1983 is to allow government officials 'the freedom to exercise free judgment' without 'being blindsided by liability derived from newly invented rights or new, unforeseen applications of pre-existing rights.' " *quoting Pinder v. Johnson,* 54 F.3d 1169, 1173 (4th Cir.) (en banc), *cert. denied,* 516 U.S. 994, 116 S.Ct. 530, 133 L.Ed.2d 436 (1995). Therefore, the right allegedly violated "must be articulated in a 'particularized' and 'relevant' way." *Cromer,* 88 F.3d at 1325, *quoting Anderson v. Creighton,* 483 U.S. 635, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987), to preclude "[a] plaintiff [from] merely assert[ing] the violation of some overarching entitlement to a named right. Instead, he must be sufficiently specific to allow us to decide whether a reasonable official would understand that what he did violates that right." *Id.* (internal quotations omitted).

By 1989, several years prior to the events at issue, the United States Supreme Court had definitively established that a demand for a urine specimen, or consent to be randomly subjected to one, constitutes a search within the meaning of the Fourth Amendment. *See Skinner,* 489 U.S. at 617, 109 S.Ct. 1402; *Von Raab,* 489 U.S. at 665, 109 S.Ct. 1384. However, in those cases the Court also established that

a public employer could conduct these searches absent a warrant or probable cause if the employees worked in positions that greatly affected public safety and if the employer had: (1) adopted a random, suspicionless employee drug-testing program; or (2) an individualized suspicion about a particular employee.

■ In the instant matter, Defendants could have ordered a urinalysis pursuant to their individualized suspicion about Plaintiff's involvement in drugs or the waiver he and all other police officers executed allowing Defendants to test for drugs at any time, with or without cause. Therefore, even if Defendants could not have reasonably believed that their drug testing program was constitutionally sound, they knew that they had individualized suspicion about Plaintiff was involved in drugs. The Supreme Court has held that testing upon articulable suspicion is constitutionally sound. The Fourth Circuit reached the same conclusion in *Thomson v. Marsh.* Therefore, Defendants did not violate a clearly established right and would be entitled to qualified immunity on Plaintiff's § 1983 claims.

### B. *Count II—Civil Conspiracy*[34]

To establish a cause of action for civil conspiracy under 42 U.S.C. § 1985, a Plaintiff must prove "(1) a conspiracy of two or more persons, (2) who are motivated by a specific class-based, invidiously discriminatory animus to (3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all, (4) and which results in injury to the plaintiff as (5) a consequence of an overt act committed by the Defendants in connection with the conspiracy." *Simmons v. Poe,* 47 F.3d 1370,

---

**34.** In his Complaint, Plaintiff did not specify the legal origin of his conspiracy claim. Defendants assumed that Plaintiff brought his claim under a common law theory. Subsequently, Plaintiff maintained that the conspiracy count was brought under § 1985, and Defendants responded to Plaintiff's clarification. Despite having filed an amended

response to Plaintiff's summary judgment motion based on Plaintiff's clarification, Defendants maintain that Plaintiff should not be allowed to pursue his conspiracy claim pursuant to § 1985. The Court concludes that Defendants were in no way prejudiced by Plaintiff's clarification, and will therefore consider the § 1985 claim.

1376 (4th Cir.1995). Moreover, the Fourth Circuit has stated that to prove a section 1985 conspiracy, "a claimant must show an agreement or a meeting of the minds by Defendants to violate the claimant's constitutional rights." *Id.* at 1377 (internal quotations omitted).

■ In the instant case, Carroll asserts that Leppo and Dr. Middleton engaged in a conspiracy to violate his constitutional rights because: (1) "Leppo told Middleton that he had information that Carroll was a drug user and he told Middleton to obtain a urine specimen from Carroll the next time he came to the office and submit it for laboratory testing"; (2) "Middleton says that Leppo told him not to tell Carroll that the specimen would be subject to urinalysis. Middleton questioned Leppo as to whether he should tell Carroll about the drug test; and was told that it was not necessary because Carroll had signed a waiver that allowed him to be tested at any time with or without cause"; (3) "Middleton made a note in Carroll's medical record that Leppo had asked that Middleton 'obtain a urine specimen without the patient's knowledge for drug screening'" (alteration omitted); and that (4) "[a]s a result of this conversation with Leppo, Middleton obtained and submitted Carroll's drug testing to the laboratory for drug testing without telling him."

That Dr. Middleton and Leppo offered the same justification for not telling Plaintiff that his urine specimen would be screened for drugs is not evidence that they acted in a conspiracy to violate his rights. Instead, Carroll presents a contention that the Fourth Circuit warned against in *Simmons*. Indeed, Carroll testified that he had no reason to believe that, if his urine was in fact switched or mishandled as he alleges, that Dr. Middleton, Dr. Middleton's nurse, or Leppo did so deliberately. Carroll Dep. at 83–84. Simply

put, the facts upon which Carroll relies to establish his § 1985 conspiracy claim establish only that Leppo believed that he was acting lawfully in obtaining Carroll's urine for a urinalysis because of the waiver that Carroll had signed. Moreover, assuming that Carroll had put forth evidence that established that *Leppo* was acting with a discriminatory animus to deprive Carroll of his Constitutional rights, *Dr. Middleton*'s request for assurance that he could obtain the specimen for urinalysis without Carroll's knowledge demonstrates that Carroll's conspiracy claim does not meet the *"two or more* persons" requirement. Furthermore, the fact that Dr. Middleton noted in Carroll's permanent medical record that Carroll's urine was being tested without his knowledge only strengthens Defendants' argument that Dr. Middleton did not act with an invidiously discriminatory animus. Finally, it is undisputed that Dr. Middleton obtained Carroll's specimen for a legitimate, nonpretextual purpose: to test his urine for the presence of blood because of his high blood pressure episode a couple of days before. Accordingly, summary judgment shall be entered against Carroll as to Count II.

### C. *Count V—Defamation*

■ To prove a defamation cause of action in Maryland, a plaintiff must establish that "the defendant made a defamatory statement to a third person; the statement was false; the defendant was legally at fault for making the statement; and, the plaintiff thereby suffered harm." *Fearnow v. C & P Tele. Co.*, 104 Md.App. at 66, 655 A.2d 1 (Md.Ct.Sp.App.1995), *rev'd on other grounds*, 342 Md. 363, 676 A.2d 65 (Md.1996) (citing cases). In addition, where, as here, the plaintiff is considered to be a public figure [35], he must prove "by clear and convincing evidence that the allegedly false defamatory publication was

---

35. Under Maryland law, it is well settled that a police officer of any rank is a public figure for purposes of a defamation cause of action. *See Fearnow v. C & P Telephone Co.*, 104 Md.App. 1, 655 A.2d 1 (1995) *rev'd on other grounds*, 342 Md. 363, 676 A.2d 65 (1996); *Seymour v. A.S. Abell Co.*, 557 F.Supp. 951, 957 (D.Md.1983).

made with actual malice." *Id.* at 67, 655 A.2d 1. Furthermore, Maryland law affords a "qualified privilege" to "any person who makes an oral, written or printed report about matters involving violations of the law." *Id.* at 67, 655 A.2d 1 *quoting Seymour v. A.S. Abell Co.,* 557 F.Supp. 951, 955 (D.Md.1983) This qualified privilege "applies to all persons who pass on matters involving violation of the law . . . . [even where] no formal criminal charges were ever filed, . . . police investigation and administrative charges unquestionably constitute matters involving violation of the law. Indeed most, if not all, police activity concerns matters involving the violation of the law. Simply put, police business is legal business, most especially so when the police investigate and file administrative charges against wrongdoing of their own." *Id.* at 68, 655 A.2d 1 *quoting Seymour,* 557 F.Supp. at 955–56.

 In the instant case, Carroll has identified only *one* instance in which Defendants communicated with a third party regarding the reason for Carroll's termination. Pl.Mot.Summ.J. at 20.[36] Specifically, Carroll contends that his application for employment was rejected by the Frederick County Police Department ("FCPD") "because the Westminster City Police Department advised that Carroll was fired because of a drug problem." Pl.Mot. Summ.J. at 20.

Carroll's defamation claim fails because, taking the facts in the light most favorable to Carroll, there is no genuine issue of material fact as to whether Defendant's statements were false. Moreover, the alleged defamatory publication was made with Carroll's consent. Having reviewed Carroll's personnel file, the Court concludes that it contains documents, such as the LEOBR hearing findings and Leppo's memo to Carroll that he was being terminated, that reveal that Carroll was terminated because of the results of the urinalysis test.

These statements are not false because, regardless of whether the test results were obtained in an unconstitutional manner,[37] Carroll was in fact fired because of the positive results. In addition, these statements are privileged because they relate to matters involving violation of the law.

 It is further undisputed that Defendant's sole communication to FCPD was to grant FCPD access to Carroll's personnel file pursuant to a release executed by Carroll. Therefore, Carroll consented to the release, and directed the publication of, his personnel records to FCPD. Consent is an absolute defense to defamation. *See Bagwell v. Peninsula Regional Medical Center,* 106 Md.App. 470, 509, 665 A.2d 297 (Md.Ct.Sp.App.1995).

Plaintiff contends that "[w]ithout a workplace drug testing policy meeting constitutional standards to assure accuracy and reliability, Defendant Leppo knew or had reason to know that he could not justifiably rely upon the drug test results

---

**36.** Plaintiff alleges that Defendant "advised prospective employers that Carroll was a drug user [which] resulted in Carroll being rejected for employment with a number of other police departments . . ." Pl.Mot.Summ.J. at 20. Plaintiff failed, however, to specify which police departments had received this false communication from Defendants. Therefore, only the properly identified communication with the Frederick County Police Department can support Plaintiff's claim. Moreover, it is undisputed that when another prospective employer, the Hickey School, called Leppo for a reference, Leppo confirmed Plaintiff's dates of employments and responded affirmatively to the caller's inquiry as to whether Plaintiff

held a position of responsibility that required him to make decisions. Leppo Dep. at 101. In fact, Plaintiff testified that when he secured employment at Hickey, he called Leppo and "thanked him for not giving me any bad reference." Carroll Dep. at 115–16. In addition, Plaintiff testified that he does not know of any communications Leppo or Middleton had with others regarding Plaintiff's drug test, nor does Plaintiff "know of any other persons who have such information." Carroll Dep. at 93–94.

**37.** The Court has concluded that the test was conducted in a constitutional manner.

thus obtained and his subsequent reporting of the drug tests [sic] results to a prospective employer constituted defamation." Pl.Resp. to Defs.Mot.Summ.J. at 13. Carroll's argument is unavailing. First, even if Leppo knew that his Department's policy was unconstitutional, he certainly had individualized, articulable suspicion upon which to he could rely to test Carroll. Second, any deviations Dr. Middleton made in his handling of the sample do not render the test unconstitutional. Third, Leppo cannot be said to have notice of Dr. Middleton's departures from procedure when Roche Labs provided procedures for collecting the specimen. Accordingly, Defendants are entitled to summary judgment as to Carroll's defamation claim.

## V. CONCLUSION

For the foregoing reasons:

1. The Motion of Defendants City of Westminster and Chief Sam Leppo for Summary Judgment [Paper No. 32–1] is GRANTED.

2. Defendant John Middleton's Motion to Dismiss [Paper No. 33–1] is DENIED.

3. Defendant John Middleton's Motion for Summary Judgment [Paper No. 33–2] is GRANTED.

4. Plaintiff's Motion for Partial Summary Judgment [Paper No. 34–1] is DENIED.

5. Judgment shall be entered by separate Order.